In re HERITAGE VILLAGE CHURCH AND MISSIONARY FELLOWSHIP, INC. a/k/a PTL, PTL Club, Fort Heritage Campgrounds and Christian Retreat, PTL Enterprises, Debtor.

M.C. BENTON, Jr., Trustee for Heritage Village Church and Missionary Fellowship, Inc., Debtor, Plaintiff,

v.

James O. BAKKER, Tammy Faye Bakker and David A. Taggart, Defendants.

Bankruptcy No. 87–01956C–11.
Adv. No. 88–0086.

United States Bankruptcy Court, D. South Carolina.

Nov. 9, 1988.

R. Bradford Leggett and Thomas White, Allman, Spry, Humphreys, Leggett, and Howington, P.A., Winston–Salem, N.C., for Trustee.

W. Ryan Hovis, Berry, Dunbar, Daniel, & Hovis, Rock Hill, S.C., James H. Toms, Toms and Bazzle, P.A., Hendersonville, N.C., for James O. Bakker and Tammy Faye Bakker.

Patricia R. Collins, Cotten, Day & Selfon, Washington, D.C., for David A. Taggart.

## MEMORANDUM OPINION

RUFUS W. REYNOLDS, Bankruptcy Judge.

This is an adversary proceeding which originated by virtue of the Trustee's lodging objections to a claim which had been filed in this proceeding on behalf of James O. Bakker and Tammy Faye Bakker and a claim which had been filed on behalf of David A. Taggart. When the Trustee coupled his objection to the claims with a counterclaim filed on behalf of the estate, the actions became an adversary proceeding pursuant to the provisions of the Bankruptcy Rule 3007. Although the original caption of the adversary proceeding designated the Bakkers and Taggart as plaintiffs and the Trustee as the defendant, the Court considers that the designation of the Trustee as the plaintiff in this proceeding is more representative of the true positions of the parties and, accordingly, directs that for the purpose of any further transac-tions, the amended caption as is set forth on this Memorandum Opinion be used in this adversary proceeding.

The Court has presided over eight days of live testimony, has considered deposi-tions and exhibits introduced into evidence during the trial consisting of 2,000 pages or more, and has taken judicial notice of mat-ters appropriately before it. Based on the consideration of the foregoing, the Court, in this Memorandum Opinion, sets forth its findings of fact and conclusions of law.

## PROCEDURAL CONTEXT OF CLAIMS AND COUNTERCLAIMS

The Chapter 11 proceeding for Heritage Village Church and Missionary Fellowship, Inc., (hereinafter "PTL") was instituted by the filing of a voluntary petition on June 12, 1987. In June, 1987, PTL was being led by Jerry Falwell, who had assumed the position of chairman of the board of di-rectors on March 18, 1987. In October, 1987 Mr. Falwell and the then board of directors for the debtor in possession re-signed. Subsequently, Dr. David W. Clark was appointed as Trustee for PTL. On May 20, 1988, Dr. Clark resigned as Trust-ee and the present plaintiff, M.C. Benton, Jr., was appointed Successor Trustee.

On September 9, 1987, James O. and Tammy Faye Bakker filed a proof of claim seeking recovery of "$1.3 Million plus". This claim was premised on an alleged right to recover the value of a parsonage and on alleged rights to recover sums due based on copyrights, trademarks and other intangibles. On October 28, 1987, David A. Taggart filed a proof of claim seeking re-covery of $187,500.00 for employment ser-vices rendered under an employment con-tract. On January 6, 1988 the Trustee filed preliminary objections to the claims, and on February 1, 1988 the Trustee filed expand-ed objections to the claims of James O. Bakker, Tammy Faye Bakker and David A. Taggart and a counterclaim against those three individuals. The Trustee's counter-claim, in addition to making general allega-tions relating to corporate mismanagement and wrongdoing, also focused on alleged inordinate personal benefits derived from

PTL by the defendants, specifically in the fiscal years ending 1984, 1985, 1986 and 1987. The claim by the Trustee seeks recovery for hundreds of items procured by James Bakker, Tammy Faye Bakker, and David Taggart. These items were discovered through a search into a financial jungle which involves millions of dollars of expenditures over the period of four years in question of operations of PTL.

Following the filing of the Trustee's counterclaim, discovery ensued and on September 12, 1988 the trial in this adversary proceeding commenced with the Trustee's presentation of his case in chief. At the end of that week, the trial was recessed until October 17, 1988 in order to give the defendants an opportunity if they desired, to conduct any further discovery prior to the presentation of their case. On October 17, 1988, the trial recommenced and was concluded later that week.

## GENERAL BACKGROUND OF PTL

James Bakker and Tammy Bakker started the PTL ministry in Charlotte, North Carolina about 15 years ago. At all times pertinent to this Memorandum Opinion, James Bakker was president and chairman of the board of directors. David A. Taggart served as a vice president and was James Bakker's administrative assistant. Although Tammy Faye Bakker held no formal position as an officer or director of PTL, she had great influence over the conduct of PTL's operations and there is no evidence that any of her requests were ever denied or rejected.

The Bakkers first operated in an empty building or warehouse. After progress and revenues increased, PTL moved its ministry to South Carolina, near Rock Hill and just south of the North Carolina line. It continued using Charlotte, North Carolina for its mailing address. Approximately 2300 acres of vacant land were purchased over a period of time. A modern broadcasting and producing video studio, costing millions of dollars, was constructed. Satellite rights were leased from HBO at a cost of approximately $235,000 in monthly rental. A five-hundred room hotel with a connecting shopping center was built. This hotel is identified as the Heritage Grand Hotel, as distinguished from the new Heritage Grand Towers. The twenty-two story Grand Towers Hotel is approximately 90% completed. A ninety-six room motel, known as the Heritage Inn, was constructed. A large office building known as the World Outreach Center (WOC) was constructed, sewage and water systems were installed, streets were paved, and approximately 1,200 people are now permanent residents of PTL, in the unincorporated community known as Heritage Village. PTL operated a farm, built a $14,000,000 water park, a church, bunkhouses, and many other facilities. All of these improvements were oriented to the operation of the PTL ministry and were featured in their PTL broadcast programs. In 1986 the debtor claimed that it had a greater attendance than any other amusement center in the United States except Disney World. During the months of November, December and January, millions of lights were erected for the celebration known as Christmas City and people attended from far and wide.

It was in this setting that unbelievable expenditures and waste of the debtor's money were committed by the parties involved and their associates, and money was wrongfully taken from PTL.

## THE THIRD FLOOR

The World Outreach Center, a three story building also known as the WOC building housed the administrative and financial personnel of PTL. On the first floor of the World Outreach Center, the mail receiving and cash counting functions were conducted. The PTL vault was located on the first floor, together with sophisticated computer hardware and software which was used by PTL to keep track of its financial and fund raising activities. On the second floor of the World Outreach Center, the general financial activities of PTL were conducted. The second floor also housed employees who dealt with the PTL television network relationships with cable television systems and television affiliates. It was on the

second floor that Peter Bailey, the vice president of finance, had his office.

The third floor of the World Outreach Center was where the power of PTL was focused. The offices of James Bakker, Tammy Faye Bakker, David Taggart, Richard Dortch, Shirley Fulbright and Patricia Harrison were located on this floor. The offices of James Bakker, David Taggart and Shirley Fulbright were side by side. Access to the third floor by other employees of PTL was limited. The phrase, "the third floor", had a special and unique meaning to PTL employees. A memorandum or directive coming from "the third floor" was to be complied with without question. It was "the third floor" that determined PTL policy and direction and it was "the third floor" that determined that PTL policies relating to documentation of cash advances and expenses would not apply to those individuals located at that level.

As an example of the extraordinary levels of compensation paid to third floor executives, Chart #1, below, itemizes bonuses paid to certain individuals within only the last nine months before James Bakker's resignation on March 18, 1987:

## CHART #1

### BONUSES—June 1986 through March 17, 1987

| | J.O. BAKKER | T.F. BAKKER | D.A. TAGGART | R. DORTCH |
|---|---|---|---|---|
| 7/86 | | | 11,000.00 | 100,000.00 |
| 7/01/86 | | | 110,000.00 | |
| 7/16/86 | 350,000.00 | 115,000.00 | | |
| 11/07/86 | 10,000.00 | | | 100,000.00 |
| 11/10/86 | 190,000.00 | 20,000.00 | | |
| 11/20/86 | | | 125,000.00 | |
| 11/24/86 | | 20,000.00 | | 50,000.00 |
| 12/18/86 | 20,000.00 | 10,000.00 | | |
| 12/19/86 | | | 22,700.00 | |
| 12/22/86 | 20,000.00 | | | 100,000.00 |
| 1/87 | | | | 50,000.00 |
| 2/04/87 | 300,000.00 | 170,000.00 | | |
| 2/13/87 | 150,000.00 | | | |
| 2/16/87 | | | 225,000.00 | |
| 3/87 | | | | 53,010.00 |
| TOTAL | $1,040,000.00 | $335,000.00 | $493,700.00 | $453,010.00 |
| GRAND TOTAL | $2,229,305.00 | | | |

## THE LIFETIME PARTNERSHIPS

PTL records reflect that over the five-year period before this case was filed, PTL received approximately $400,000,000.00 in donations, including the sale of $160,000,-000.00 of Lifetime Partnerships. The prices for Lifetime Partnerships were $500 for the Bunkhouse, and $1,000 plus for the Grand Hotel and Grand Towers. For example, under one type of Lifetime Partnership, the payors were promised four days and three nights free lodging each year for as long as they lived, with other benefits including free admissions to different events. At the time of the filing of the case, there were about 114,000 active Lifetime Partners. No financial reserve in the nature of an escrow or like facility was made for the future demand of the needs of the Lifetime Partners. Book entries were made as to what was to be reflected as income in a given year and what amount was being amortized to later years. As will be noted below, most of the money raised for the major projects, which was the basis for soliciting these contributions or partnership sales, was never applied to the project involved.

In 1983 and 1984, James O. Bakker created the concept of selling Lifetime Part-

nerships. Mr. Bakker's vision was to use these revenues for the purpose of financing construction projects on the PTL premises, such as hotels and other high cost projects. PTL started advertising and selling Lifetime Partnership shares or benefits over the network to raise these funds. These donations were in addition to regular contributions. As Lifetime Partnership revenues increased, regular contributions declined. A comparison of the two is as follows:

| Fiscal Year Ending | Free Will Donations | Lifetime Partnerships |
|---|---|---|
| 1983 | $48,236,282.00 | 0.00 |
| 1984 | $52,932,581.00 | $16,827,547.00 |
| 1985 | $42,056,220.00 | $49,486,462.00 |
| 1986 | $43,691,001.00 | $56,654,968.00 |
| 1987 (thru 3/87) | $26,104,422.00 | $41,724,324.00 |

During the time that Lifetime Partner memberships were being sold over the broadcast system (which included all of the United States and part of Canada) for the different building projects, the proceeds received were being placed into designated accounts for the various projects. However, as soon as the funds were placed in the account for this purpose, most of the money was drawn out for operating and administrative purposes, including the payment of excessive salaries and bonuses, and for disbursements to cover the cost of extravagant travel and entertainment expenses. This left insufficient funds remaining for the projects. Permanent financing was attempted for these projects but only $15,000,000–$20,000,000 in long-term financing was obtained.

### PTL'S FINANCIAL ACTIVITY

For the fiscal year ending May 31, 1984, PTL had total revenues of $66,295,993.00 and total expenses of $67,074,455.00. For that fiscal year expenses exceeded revenues by $778,462.00,

For the fiscal year ending May 31, 1985, PTL had total revenues of $72,177,296.00 and total expenses of $89,707,470.00. For that fiscal year expenses exceeded revenues by $17,530,174.00. According to the year-end audit for the year 1985, income from Lifetime Partner contributions was amortized by spreading 90 percent of that revenue over a seven-year period, using the sum of the years digits method.

For the fiscal year ending May 31, 1986, PTL, based on its year-end audit, had total revenues of $128,770,195.00 and total expenses of $108,922,206.00. According to the combined statements of revenues and expenses, prepared by the accounting firm of Laventhol and Horwath, and presented in the annual audit for 1986, revenue exceeded expenses by $19,847,989.00. However, for this fiscal year, the method of amortizing lifetime partner income was changed to a method which, according to the year-end audit, was, in the opinion of the ministry's management under Mr. Bakker, more clearly reflective of the receipt and use of Lifetime Partners' payments. The effect of this change increased income by approximately $24,950,000.00. If the same method used for 1985 had been used in 1986, expenses would have exceeded income by $5,102,011.00.

Neither method of amortizing the Lifetime Partner revenue, either as reflected in the audit for the fiscal year ending May 31, 1985, or in the audit for the fiscal year ending May 31, 1986, was in accordance with generally acceptable accounting practices. According to generally accepted accounting practices, such lifetime income should have been amortized over the expected life span of the purchasers, not some shorter period. The effect of failing to amortize this revenue over the life expectancy of the donors was to reflect an artificial increase in income for 1985 and 1986 in the year-end audits, and convey to bankers and other outside parties a false sense of financial solvency.

For the fiscal year beginning June 1, 1986, through March 1987, PTL's gross revenues, including all Lifetime Partner contributions, were $91,969,508.00 of which $41,724,324.00 was Lifetime Partner income. For the same period of time, total expenses were $72,351,723.00.

Throughout the period of the fiscal years 1983 through 1987, with the exception of only a few months, cash was in very short supply at PTL, and monthly financial information revealed that it was not able to

discount any of its bills and was not able to meet bills as they came due in the ordinary course of business. Simply stated, the organization was in serious financial trouble.

Because PTL's spending constantly outpaced its contributions, cash flow was always weak and this brought about the "floating of checks". Checks for payment of the bills, including operating expenses, were written and later placed in circulation without sufficient funds shown on the corporation's books to cover these checks. This was done with the expectation of receiving funds by the time the checks got to the bank. This "floating" started out with a few days margin and then gradually increased to the point in 1986, when funds would have to be transferred from savings accounts to cover the float.

For the obligations incurred by the Lifetime Partner program, which raised over $164,000,000.00, there was no cash set aside by PTL to take care of the continuing obligations which would be incurred over the years by the Lifetime Partner program. All of the money was spent primarily for current operations, rather than being set aside to fund costs of construction or expenses which would be created by furnishing four days and three nights of lodging for no additional payment. At the end of March 1987, the month during which Mr. Bakker resigned, PTL had a cash deficit of $323,766.00, current assets of $9,370,-556.00, and current liabilities of $36,843,-567.00.

An example of gross mismanagement of the Lifetime Partnership Program involved the campaign for the Heritage Grand Towers, a large tower hotel to be used by guests at PTL. Before or at about the time construction began, over $20,000,-000.00 had been raised by the promotion for this project. However, at the time construction began, all but about $2,000,000.00 had been spent for general operations at PTL. No reserves had been maintained for construction. At that time the estimate as to the cost of the construction of the Towers exceeded $19,000,000.00. As a result of these excessive expenditures, Peter Bailey, vice president of finance, notified James

Bakker that he would no longer approve further expenditures from the account set aside for the Tower unless the expenditures were approved by Mr. Bakker, Mr. Taggart or Richard Dortch, the chief operations officer of PTL.

Budgets were prepared by PTL executives on a regular basis for use during the fiscal years. However, it was a common practice to have expenditures exceed the budgeted amounts during the course of the year. This continued throughout the period in question from 1984 through March 1987. James Bakker and David Taggart refused to give the attention necessary to effect budget controls.

James O. Bakker and David Taggart were provided on a regular basis with thorough financial information from the finance division of PTL. This information consisted of summaries of pertinent financial information, analyses of accounts payable, information concerning cash receipts and disbursements, and installment payments outstanding as of a particular date. These reports were given to Mr. Bakker on a weekly basis throughout the periods in question. In addition, copies of financial statements and balance sheets were provided and available for use by Mr. Bakker.

During the years in question, 1984–1987, three checking accounts were controlled by executives officed on the third floor of the World Outreach Center. These accounts were the Executive Account, the Executive Payroll Account, and the Parsonage Account. These accounts were not subject to normal PTL audit procedures and, in many instances, funds were withdrawn from these accounts without explanation or receipts.

The Executive Payroll Account was a confidential bank account set up in Charlotte, North Carolina and was administered by an outside accounting firm. Only the top echelon of the PTL hierarchy (James Bakker, Tammy Bakker, David Taggart, Richard Dortch and others) was paid out of this account. No employee other than persons on the third floor had any idea of who was paid or how much was paid out of this account. Even though Peter Bailey was

the vice president of finance, he was not allowed to receive information on the Executive Payroll Account. The outside auditors maintained a running account of the funds needed to supply the demand and would notify the PTL financial officer to deposit money in the account. There were only three or four people who could sign checks on this account. Included in the list were James Bakker and David Taggart. In addition to the Executive Payroll Account, the other two accounts, the Executive Account and the Parsonage Account, were also administered solely by personnel officed on the third floor. Although two signatures were required on all PTL accounts, Peter Bailey testified that he would, on occasion, sign blank checks and then deliver them to David Taggart. Peter Bailey's reward was substantial bonuses. In December 1986 he received a $30,000 bonus and another $34,000 bonus in January, 1987, one month after the first one. David Taggart's brother, James Taggart, was also a beneficiary of the syphoning of funds. He was the interior decorator employed by PTL. In addition to his regular compensation for particular work, he was paid $10,000 a month as a consultant just to be available. In other words, an availability fee. Many thousands of dollars were paid to the interior decorating company for other services as well. David Taggart owned an interest in this company and was an officer.

## THE PTL BOARD OF DIRECTORS

Mr. Bakker generally ran board meetings and made the significant reports to the board. The board consisted in the last few years of from six to seven people. Concerning the board of directors, the following additional general information is of significance:

A. The board met two to four times per year. The board meetings were not set on any particular date, but were generally called by Mr. Bakker.

B. Minutes of the previous meeting would be passed out and then collected; the board members not being allowed to take the minutes home. Information concerning the finances of PTL that was given to the board at meetings generally consisted of positive statements. For example, Mr. Bakker would say something like: "Since the last board meeting, our contributions are up. Our income has increased by 'X' number of dollars, and we are doing very well."

C. The board was never shown any financial statements, though on one occasion two volumes were presented to the board for review. The books were each six to eight inches thick.

D. Monthly financial statements and balance sheets prepared by the accounting department were never shown to the board.

E. The board of directors was never informed that PTL was in any kind of precarious financial position.

F. The board was never presented with the information contained in the numerous memos sent to Mr. Bakker by Peter Bailey, vice president of finance.

G. In all of Mr. Bakker's presentations to the board, there was never any reason for any board member to assume anything other than that things were going well.

H. Addenda attached to the minutes of board meetings which set forth bonuses for various officers of PTL were never part of the minutes passed out at the meetings and were unknown to the members of the board.

I. References to bonuses and salary in the board minutes did not specifically state amounts. The matter of the salary of Mr. Bakker came before the board only on one occasion. From June 1, 1983, through March of 1987, board members were never informed of the amount of Mr. Bakker's salary or of other specific benefits which he received.

J. Though the board of directors often voted bonuses, the board members did not specifically, except on a few occasions, state in open meeting the amount of the bonuses. It was assumed by members of the board that most bonuses were in the neighborhood of $5,000.00 to $10,000.00 for Mr. Bakker.

K. Specifically, there was no approval, implied or otherwise, for the bonuses received by Mr. Bakker, Mrs. Bakker and Mr. Taggart in 1987.

L. The board of directors did not authorize the payment of PTL funds to Jessica Hahn.

M. The board never rejected any proposal made by Mr. Bakker.

N. Board members understood that the Lifetime Partner funds were to be used for particular purposes, such as building the Heritage Grand Hotel or building the Heritage Grand Towers, and other projects. The board of directors was never told that Lifetime Partner contributions were used for day-to-day operations of PTL.

O. Board members were lulled into a sense of security concerning the finances of PTL in that Mr. Bakker told them that PTL had excellent accountants, that it had internal control by certified public accountants, that it had external audits by reputable firms, and that the corporation employed lawyers. It never occurred to the members of the board that anything other than financial integrity was practiced at PTL.

P. The board was never asked what specific amount should be contributed to Mr. Bakker's retirement fund with the Ministers Benefit Association.

In addition to the foregoing general findings relating to PTL board action, the following specific matters should also be noted. First, the board of directors was selected and controlled by James Bakker. As to finances, the board was only a board in name. Bonuses would be approved routinely without any amounts mentioned. Later, Shirley Fulbright, Bakker's secretary, or David Taggart would attach an addendum to the minutes indicating the amount of the bonuses. None of the board members, other than Dortch, had any knowledge of this wasteful flow of funds in regard to bonuses and salaries. One member testified that he had attended nine out of the last twelve board meetings, and that he was "astonished" to find out just recently about the big salaries, bonuses, and expenditures. He stated that he had never approved such amounts at the meetings, that he had never been given any minutes of the meetings which contained such information, and that no minutes had been sent out to the members of the board to review during the period in question. Only twice was a mention made of bonuses or salaries in the meeting and then directors assumed that bonuses would be nominal.

One board member was the pastor of a church in Texas. Immediately after being placed on the board, a $100,000 gift was made to his church by PTL. Another member of the board had a church in New York. Her church was given $50,000. Another member was given a bonus of $10,000; one a bonus of $5,000.

Another member was a pastor of a small church in California having 250 members. She testified that her impression of the Bible was that the minister should get ten percent of the donations, and that the "high priest" should get twenty percent.

Richard Dortch was a member of the board and was the main instigator at board meetings of any bonuses to be discussed. Dortch would preside when bonuses were discussed while Bakker left the room. The inference is clear that putting bonuses before the board was pre-planned and covered up. Prior to 1982, the corporate secretary (before Ms. Fulbright) kept very accurate and detailed minutes. She was fired.

## JAMES O. BAKKER

James O. Bakker was employed at PTL during the period beginning June 1, 1983, through March 18, 1987 as president and chairman of the board of directors. During that period of time, he received remuneration in the form of salary, bonuses, housing allowance and retirement contributions. His total remuneration for each PTL fiscal year from May 31, 1983, through May 31, 1987, is as follows:

| | |
|---|---|
| 1983–84 | $1,000,954.91 |
| 1984–85 | 839,334.48 |
| 1985–86 | 1,022,940.00 |
| 1986–87 | 1,462,940.00 |
| Total | $4,326,169.39 |

During the fiscal years of 1984 through 1987, PTL paid the utilities used at the parsonage occupied by the Bakkers. The utility expenses incurred for power and water were extremely excessive in that power bills often exceeded $1,000.00 per month, with some bills being over $2,000.00 per month. The total amount of utility charges for the Bakker parsonage paid by PTL were as follows:

| | |
|---|---|
| 1983–84 | $17,563.15 |
| 1984–85 | 21,596.24 |
| 1985–86 | 23,996.97 |
| 1986–87 | 25,472.66 |
| Total | $88,629.02 |

These utilities were paid notwithstanding the fact that the James O. Bakker also received a housing allowance during the entire period of not less than $2,000.00 per month.

The parsonage checking account was maintained by the executives, including Bakker and Taggart, on the third floor of the World Outreach Center Building. Donations from the church on the PTL premises were used to maintain this account, except when it was necessary to draw funds from other accounts. Expenses for the parsonage occupied by the Bakkers were paid out of this account, and the expenses were excessive and extraordinary particularly in light of Bakker's separate housing allowance. For the four fiscal years from 1984 through 1987, over $610,000.00 was paid out of this account for the use and benefit of James O. Bakker and his family. The expenditures included cash advances to Mr. Bakker, telephone expenses incurred at the parsonage, personal expenditures for a water slide on the premises of the parsonage, telephone expenses for a home owned by the Bakkers in California, furniture, art work, drapes, appliances, automobile insurance, clothing, security systems for the parsonage and the home in California, and numerous other expenditures.

From the executive account maintained on the third floor of the World Outreach Center Building, James Bakker received the benefit of numerous purchases which were made during the fiscal years ending in 1984 through 1987. These expenditures for the benefit of James O. Bakker total $118,001.05 and were for personal items such as limousine service, antiques, hotels, travel, cash advances, jewelry, and numerous other items.

During 1985 and 1986 there were personal expenditures from the general checking account of PTL for the use and benefit of Jim Bakker for which there is not sufficient substantiating documentation to justify classification as a business expense. These expenditures total $147,462.00 from July 4, 1984 through October 10, 1985.

In 1980 James O. Bakker had a sexual encounter with a woman by the name of Jessica Hahn while on a trip to Florida. As a result of this episode, Ms. Hahn made monetary demands upon Mr. Bakker and PTL. Subsequently funds of PTL were used to settle a legal claim by Ms. Hahn against Mr. Bakker. Funds were expended by PTL in 1985 and 1987 to settle the legal claim against Mr. Bakker and to obtain a release from Ms. Hahn. These funds were paid to attorneys, to Ms. Hahn and to a trust established for the benefit of Ms. Hahn. The payments totaled $363,700.00. (Since the institution of this case, the Trustee has recovered $185,049.66 of this amount from other sources.) Although Mr. Bakker knew that financial demands were being made on PTL by or on behalf of Ms. Hahn and that Reverend Dortch was negotiating with Ms. Hahn's representatives, Mr. Bakker never gave instructions that PTL funds were not to be used for such a purpose.

During the years 1985 and 1987, either for his own use or for that of his family, Mr. Bakker had the unfettered and unchecked use of the PTL Saberliner airplane and would also charter other airplanes for his own personal use and benefit. The value of his use of the airplane in 1985 was $102,460.76. Additionally, in 1985, he incurred Executive Air Fleet charges of $124,986.23 and in 1987 he incurred Executive Air Fleet charges of $36,919.99.

During the course of the trial, Mr. Bakker offered certain exhibits purporting to

document the fact that he had reimbursed PTL for certain items enumerated above. Of that evidence, the Court finds that a total of $72,775.61 may have been shown to have been reimbursed to PTL.

■ The philosophy of the Bakker regime was exemplified in the statement of two witnesses for James Bakker. One witness indicated that a fair compensation for James Bakker was $6,400,000 per year. The other witness testified that, according to the Bible, Bakker should get at least 10% of the income which would run in the neighborhood of $10,000,000. The Court finds that these amounts defy common sense and rational judgment. The Court takes judicial notice that the highest paid head of a government agency in the State of South Carolina with a salary approved by the Legislature is the president of the University of South Carolina who, for the years in question, had a salary under $100,-000.

At the time James Bakker resigned on March 17, 1987, PTL had approximately $30,000,000–$35,000,000 in liens, mortgages, and encumbrances. During this decline in the availability of general contributions, millions of dollars were being syphoned off by excessive spending. Such spending is shocking to the conscience to the extent that it is unbelievable that a religious ministry would be operated in such a manner.

A few of the outrageous, unbelievable, and shocking expenditures include such items as the Bakkers renting a jet plane for a two-week vacation in California at a cost to PTL of $124,000.00, including the time it sat on the ground idle. While on vacation, Bakker bought two Rolls Royces for PTL and Bakker's use. Bakker's cost $58,-884.00 and PTL's cost $27,438.00; the latter was never brought back to PTL but remained in storage for repairs. Over $8,500.00 was spent by PTL on materials for a water slide at Bakker's residence (PTL's parsonage) in Tega Cay, South Carolina. The water slide was never completed or "installed".

PTL spent $8,870 decorating Bakker's houseboat; spent approximately $5,900 for a multi-story playhouse for the Bakker children, equipped with electricity and heat; and provided around the clock security guards for each member of Bakker's family. The Bakkers bought, at PTL expense, a shower curtain for their daughter for $570. During twelve days in the month before Mr. Bakker resigned, $845,000 in bonuses were paid to the three defendants —$450,000 to Bakker, $170,000 to Mrs. Bakker and $225,000 to Taggart. Such extravagance is almost unlimited or at least it was until the funds gave out.

Perhaps the most egregious example of James Bakker's self-dealing with the assets of PTL occurred on February 4, 1987 when he was paid a bonus of $300,000.00. About a month prior to the payment of this bonus, Mr. Bakker had left the premises of Heritage USA and was never to return as its president. The apparent purpose of the payment of this bonus was to assist Mr. Bakker in the acquisition of a residence in California. Then, nine days later, on February 13, 1987, a $150,000.00 bonus was paid to James Bakker. For the second bonus, there was not even an attempt to go through the charade of obtaining board approval.

At the same time this spending occurred, the vice president of finance was telling James Bakker and his supporting personnel in weekly reports about the tailspin the debtor was in financially. As the financial condition became worse, Bakker and his group took more money for their own use.

This unauthorized and wrongful taking of funds centered around the activities and actions of James Bakker, Reverend Dortch, David Taggart and Shirley Fulbright. They worked in unison on the third floor of the WOC with all the attributes of a conspiracy.

### TAMMY FAYE BAKKER

Tammy Faye Bakker is the wife of James Bakker and was a co-host of the PTL Club or the Jim and Tammy Show. During the fiscal years 1984 through 1987, Tammy Faye Bakker received salaries and bonuses totalling $1,183,202.87 paid as follows:

| | |
|---|---|
| 1984 | $214,963.41 |
| 1985 | $257,568.04 |
| 1986 | $283,174.63 |
| 1987 | $427,478.96 |
| Total | $1,183,203.04 |

Tammy Faye Bakker indicated under oath that she was not aware of any amounts of bonuses. She indicated that she played the role of an ordinary housewife and spent whatever money they put into her account.

In addition to salaries and bonuses, Tammy Faye Bakker received disbursements for her benefit out of the Executive Account and the Parsonage Account over the years in question totalling $50,139.03. No believable evidence has been presented that these funds were either reimbursed to PTL or were reasonable and necessary business expenses for the corporation.

## DAVID A. TAGGART

David Taggart was initially employed by PTL in the music department at the television studio for a salary of $200 a week. He later became Bakker's administrative assistant and his office was moved to the third floor of the WOC building. He resigned in April 1983. He was re-employed by PTL about six or seven months later (November 1983) when James Bakker re-hired him as administrative assistant and vice president, and reinstated his office on the third floor. At this time he was to be paid an annual salary in the neighborhood of $75,000. He and James Bakker stayed together constantly, frequently discussing bonuses, raises and other matters. Their closeness was known to all, as was Bakker's heavy reliance upon Taggart to fulfill his needs. From that relationship, Taggart obtained a high degree of control and power at PTL. James Bakker was supplied with all the PTL funds, monies, and services that he desired through David Taggart. As he has done hundreds of times in this proceeding, James Bakker testified that he had no knowledge or recollection of the use of the money.

Taggart, not only served as James Bakker's executive assistant during the periods in question, but also served as a vice president in the fiscal years ending in 1984 through 1987. For these years, Taggart received salaries and bonuses as follows:

| | |
|---|---|
| 1984 | $60,662.08 |
| 1985 | $139,574.31 |
| 1986 | $210,042.29 |
| 1987 | $605,972.99 |
| Total | $1,016,251.75 |

Over the same period of time, David Taggart received numerous checks and gained money from cash advances on PTL credit cards often in amounts of $5,000.00, $10,000.00 and even $20,000.00. No supporting records have ever been found to justify Taggart's receipt of these funds and Taggart's reply to the demands of PTL accountants for supporting documents and receipts for these items was that he had the records in a "shoe box at home".

More specific examples of Taggart's unsubstantiated withdrawals of funds from PTL and undocumented utilization of PTL's credit are as follows:

(a) From the Executive Account, David A. Taggart received cash either directly or for his benefit in the total sum of $144,988.93 in the years 1984 through 1987. For these amounts there is no substantiating documentation justifying them as reasonable and necessary business expenses for the corporation.

(b) For the fiscal years ending in 1984 through 1986, David A. Taggart received cash either directly or for his benefit from the general checking account of PTL totaling $24,000.00, for which there is no substantiating documentation justifying them as reasonable and necessary business expenses of the corporation.

(c) In 1984 and 1985, David A. Taggart received *cash advances* from PTL funds totaling $89,307.55. These cash advances were never documented and were subsequently written off by PTL.

(d) David A. Taggart in 1986 and 1987 caused PTL to incur charges for air travel for which there was no documentation that the same involved proper corporate purposes. The total of these charges is $32,963.89.

(e) Sometime prior to the departure of the Bakkers from PTL in March of 1987 David A. Taggart obtained three checks from the general church account of PTL and caused Peter Bailey to sign the checks in blank. The three checks were in numerical sequence as check numbers 1929, 1930 and 1931. Check 1929 was made payable to American Express Company, was dated February 16, 1987, was in the amount of $50,000.00, and was a payment on David A. Taggart's personal American Express account. Check 1930 was made payable to American Express Company, was dated March 28, 1987, was in the amount of $45,-000.00 and was paid on the personal American Express account of David A. Taggart. Check 1931 was made payable to American Express Company in the sum of $30,000.00, was dated April 16, 1987, and was paid on the personal American Express account of David A. Taggart. On April 16, 1987, check number 1060, drawn on the PTL Executive Account, was made payable to American Express Company in the sum of $15,000.00 and paid on David A. Taggart's personal American Express account. These checks totaling $140,000.00 were not authorized by officers of PTL and documentation to justify them as a PTL expense was not presented at trial.

(f) On October 15, 1986, David A. Taggart borrowed $75,007.51 from Rock Hill National Bank. This loan was evidenced by a business loan promissory note and was secured by the assignment of a PTL certificate of deposit. On or about June 12, 1987, the proceeds from the PTL certificate of deposit were applied against the outstanding amount due and owing on this loan of $75,515.19. This amount has never been repaid to PTL.

David Taggart has offered no credible evidence which would modify or change the above figures. In his deposition he elected to take the Fifth Amendment on many of the questions asked. Further, he elected not to appear personally at any time during the trial.

David Taggart had asserted a claim for indemnification against James Bakker if it should be determined that he had any financial liability to the Trustee. The premise of the indemnification claim was that Taggart asserted no authority or control over the operations of PTL and functioned solely at the behest of James Bakker. The record, quite simply, does not indicate that this was the case. It was important that David Taggart keep Mr. Bakker happy so that Taggart could retain and maintain his position of individual power. That Mr. Taggart was conducting himself pursuant to his own personal agenda is demonstrated, *inter alia*, by his activities described above, by his incurring lavish charges at the Waldorf–Astoria in New York City on trips with James Taggart, and his obtaining numerous cash advances on PTL credit cards, including the $45,000.00 he received in one day in December, 1986 in New York City. David Taggart has offered no explanation with reference to these items and, in fact, has invoked his rights under the Fifth Amendment when asked about them. There is nothing in the record to support David Taggart's demand for indemnification from James Bakker.

## THE JOINT MISMANAGEMENT OF JAMES BAKKER AND DAVID TAGGART

As stated previously, David Taggart was a vice president of the corporation and administrative assistant to James O. Bakker, the president and chief executive officer. He has been described variously as the arms and legs of Mr. Bakker or an errand boy. During the course of his employment from 1984 through March 1987, when Mr. Bakker resigned, Mr. Taggart was responsible for all of the expenditures incurred on all trips taken by Mr. Bakker and his family and other matters which were for the benefit of Mr. Bakker, Mr. Taggart or Mr. Bakker's family. These expenditures included charges and cash advances on American Express, Master Card, and VISA accounts maintained for the use and benefit of officers of PTL. During the period in question, charges and cash advances were made as are more particularly described on the charts set forth hereinafter. No substantiating documentation has been shown

to exist which would justify these expenditures as being proper business expenditures for the corporation and are, therefore, chargeable jointly to Mr. Bakker and Mr. Taggart.

In the years 1985 and 1986, expenditures were made from the PTL general checking account in the amounts of $378,280.47 and $355,660.50 respectively for transportation, meals, lodging, entertainment, and other travel expenses for both domestic and foreign travel. These payments either directly or indirectly were for the benefit of Mr. Bakker and Mr. Taggart and no documentation has been furnished to demonstrate that any of these expenses were for proper corporate purposes.

Financial reports and memoranda from the chief financial officer, Peter Bailey, were regularly sent to Mr. Bakker and Mr. Taggart for their review. Throughout the entire period of time in question, Mr. Bailey informed Mr. Bakker that there were problems with regard to controlling spending at PTL. For a period of over four years, Mr. Bailey reported numerous concerns of his concerning the financial stability of PTL. Mr. Bailey testified that he would often have discussions with Mr. Taggart concerning the financial condition of PTL. Yet, there was little response from Mr. Bakker or Mr. Taggart with regard to solving any of the financial problems. Examples of the reports that Mr. Bailey would make are as follows:

A. In 1983, Mr. Bakker was informed that firm bids were not being obtained for construction projects and that this was causing substantial losses to PTL. Yet, Mr. Bakker did nothing to correct this situation.

B. Mr. Bakker was warned in 1983 about the problem of controlling capital expenditures. Often estimates from capital expenditures were exceeded greatly by the actual costs. This continued throughout Mr. Bakker's tenure.

C. On March 21, 1983, Mr. Bakker was informed that PTL was having trouble meeting its current obligations, and that the corporation should make efforts to pay for its construction as it goes rather than through debt financing. These recommendations were not heeded by Mr. Bakker.

D. For the last four years of Mr. Bakker's and Mr. Taggart's tenure, there was a constant problem with keeping the PTL program on various television stations because of failure to pay these stations, and on occasion certain stations would terminate carriage of the program.

E. In June of 1983, the financial crisis got to the point where some program guests were asked to pay their own expenses.

F. Many of the bonuses received by Mr. Bakker and Mrs. Bakker were granted during periods of extreme financial hardship for PTL, such as the bonuses granted during the summer of 1983, when stations were threatening to terminate their relationship with PTL and guests were asked to pay their own expenses.

G. It was a normal practice for savings to be used to pay current operating expenses.

H. Throughout the tenure of Mr. Bailey as chief financial officer, there were constant problems in meeting the payroll. Requests were made of Mr. Bakker and Mr. Taggart to assist in the reduction of payroll, but very little was done by them in response to these requests.

I. Mr. Bakker let it be known that he did not want to hear any bad news, so people were reluctant to give him bad financial information. As a result, Mr. Bakker tended to stay with people who gave him positive information.

J. It was a common practice for PTL to write checks for more money than it showed in its checkbook. The books would often show a negative balance, but the money would eventually be transferred or raised to cover the checks written. This "float" often would be three to four million dollars.

K. Cost overruns on PTL projects were a common occurrence. For example, the PTL television network studios were projected to cost $2,500,000.00. The actual cost exceeded $4,000,000.00. Another ex-

ample is the PTL home. The projected total cost was $400,000.00. The actual cost was in excess of $1,355,000.00. Despite attempts on the part of the finance department to exercise control over construction costs, Mr. Bakker and Mr. Taggart failed to implementation of any such control.

L. Most of the events and programs at PTL made available to the public were operated at a loss. For example, the water park at its inception was not projected to have a cash flow surplus, but a substantial cash flow deficit. The passion play, performed in an amphitheater on the premises, never ran at a profit. The public transportation maintained on the premises often had monthly losses equal to the cost of operating this system.

M. When the lifetime partner program began in 1984, energy was placed into raising Lifetime Partner funds rather than raising general contributions. As a result, the Lifetime Partner funds increased substantially, and general contributions declined significantly through March of 1987.

N. Other divisions of PTL which lost money on a regular basis were recreation, food service, air transportation when PTL owned a jet, and *The Heritage Herald,* a newspaper published by PTL.

O. On October 17, 1984, Peter Bailey warned Jim Bakker that they were "... in a false euphoria. We must cut back on spending or continue to use tower funds to maintain operations." What Mr. Bailey was referring to was that Lifetime Partnership contributions were coming in heavily, that general contributions had dropped off, and that sooner or later, when money was no longer being raised through the sale of Lifetime Partnerships, there would be a severe financial crisis. Neither Mr. Bakker nor Mr. Taggart did anything in response to this warning.

P. Fiscal controls were so lax that meals charged by PTL employees and paid for by PTL, at one period of time in 1984 and later, exceeded tens of thousands of dollars per month, reaching a high point of about $90,000.00 in one month.

Q. For special projects, there existed a problem of employees working excessive overtime hours, thereby increasing PTL's payroll substantially. Mr. Bailey complained to Mr. Bakker and Mr. Taggart about this situation, but Mr. Bakker failed to take any remedial action or authorize Mr. Bailey to take any action to correct this problem.

R. Both Mr. Bakker and Mr. Taggart, during the entire period in question, failed to give attention to financial matters and the problems of raising money and cutting expenses.

Mr. Bakker, as an officer and director of PTL, and Mr. Taggart, as an officer of PTL, approached the management of the corporation with reckless indifference to the financial consequences of their acts. While on the one hand they were experiencing inordinate personal gain from the revenues of PTL, on the other hand they were intentionally ignoring the extreme financial difficulties of PTL and, ironically, were, in fact, adding to them. For example, during May, 1984, when PTL's current liabilities exceeded its current assets by $12,833,855.00, Mr. Bakker accepted a bonus of $390,000.00. In February of 1987, when PTL's current liabilities exceeded its current assets by $22,480,327.00, bonuses totalling $845,000 were paid to James Bakker, Tammy Faye Bakker and David Taggart. Such conduct demonstrates a total lack of fiduciary responsibility to the good of PTL.

## THE DEFENDANTS' STANDARD OF CARE AND CONDUCT

It is clear from the outset that the Trustee has standing and authority to recover property of the debtor and to litigate accompanying actions thereto. See, *In re Dr. J. Herbert Fill,* 82 B.R. 200 (Bkrtcy.S. D.N.Y.1987); *In re Mortgage America Corp.,* 714 F.2d 1266 (5th Cir.1983).

South Carolina has codified the duty of care required of an officer and director. The South Carolina statute provides as follows:

A director or officer shall perform his duties as a director or officer, including his duties as a member of any committee

of the Board of Directors upon which he may serve, in good faith, in the manner he reasonably believes to be in the best interest of the corporation and of its shareholders, and with such care as an ordinary prudent person in a like position would use under similar circumstances. S.C.Stat.Ann. § 33–13–150(a) (1976).

■ Good faith requires the undivided loyalty of a corporate director or officer to the corporation and such a duty of loyalty prohibits the director or an officer, as a fiduciary, from using this position of trust for his own personal gain to the detriment of the corporation. In this instance, there are no shareholders of the corporation; however, even though there are no shareholders, the officers and/or directors still hold a fiduciary obligation to manage the corporation in its best interest and not to the detriment of the corporation itself.

The South Carolina Statute provides that an officer and director should use such care as an ordinary prudent person in a *like position* would use under similar circumstances. Therefore in analyzing the degree of care required of the defendants, we must look at the positions that these individuals held. As the facts heretofore have been found, these defendants held positions of extreme confidence and trust and used those positions to the detriment of the corporation and for personal gain.

The applicable standard of care for officers and directors is established in South Carolina in the case of *Gilbert v. McLeod Infirmary*, 219 S.C. 174, 64 S.E.2d 524 (1951). The Supreme Court of South Carolina, in analyzing the duties of a member of a board of a charitable corporation held as follows:

The foundation of suits such as this is a relation in the nature of an expressed trust between a director and his corporation, which is also similar in quality to that of a principal and an agent. The directors or other members of the managing board are sometimes called Trustees. Their legal position is the same no matter by what name they are called, whether directors, trustees, or governors....

Undoubtedly the directors of a corporation and the management of the corporate affairs occupy a position of extreme trust and confidence and exercise great power for good or bad over the corporation and its shareholders. They are agents for the corporation. Toward it and the shareholders they undoubtedly stand in a fiduciary relation as far as the corporate business is concerned....

64 S.E.2d at 528–529.

The South Carolina Statute implies a duty of loyalty to the corporation. The duty of loyalty and good faith requires that the director or officer not use his office for personal gain at the corporation's expense. S.C.Stat.Ann. § 33–13–160 describes certain situations within which directors or officers, who have a personal or adverse interest, may deal with the corporate entity. Under the facts of this case, none of the exculpatory provisions of S.C.Stat.Ann. § 33–13–160 apply.

■ Both Bakkers, as well as David Taggart, were in a position of great power over PTL. James Bakker exercised a great deal of control over his board. A director who exercises a controlling influence over co-directors cannot defend acts committed by him on the grounds that his actions were approved by the board. *Gilbert, supra,* p. 530.

The duty of care and loyalty required by the defendants was breached inasmuch as they (1) failed to inform the members of the board of the true financial position of the corporation and to act accordingly, *Baker v. Mut. Loan Inv. Co.*, 213 S.C. 558, 50 S.E.2d 692 (1948); failed to supervise other officers and directors, *Olin Mathieson Chemical Corp. v. Planters Corp.*, 236 S.C. 318, 114 S.E.2d 321 (1960); failed to prevent the depletion of corporate assets, *Mortimer v. McKeithan Lumber Corp.*, 127 S.C. 266, 120 S.E. 723 (1923); and violated the prohibition against self-dealing, *Gilbert, supra.*

It is clear that officers and directors will not be held accountable for mere mistakes in judgment. The acts of the defendants did not constitute mere mistakes in judg-

ment, but constituted gross mismanagement and a neglect of the affairs of the corporation. Clearly, the salaries, the awards of bonuses and the carte blanche exercised over PTL checking accounts and credit cards were excessive and without justification and there was lack of proper care, attention and circumspection to the affairs of the corporation. The defendants breached their duty to manage and supervise and the duty to specify with particularity the amounts of bonuses paid to directors and officers. *Harrry Fox, Inc. v. Commissioner of Internal Revenue,* 37 T.C.M. 453 (1978).

While Tammy Faye Bakker was not officially an officer or director of PTL, she held a position of extreme confidence and trust and practical authority over the affairs of PTL and used that position for personal gain. She was grossly overcompensated and was unjustly enriched as a result of the monies paid to or for her benefit.

Each of the defendants breached their duty of loyalty by violating the prohibition against self-dealing, since such conduct was not in good faith. *Stern v. Lucy Webb Hayes Nat. Train. Sch. For Deacon & M.,* 381 F.Supp. 1003 (D.D.C.) (1974). Trustees and corporate directors for not-for-profit organizations are liable for losses occasioned by their negligent mismanagement.

There is an open question as to the standard of care that is required in South Carolina. One line of cases holds that directors/officers may be held liable for even ordinary negligence. The better reasoned opinions including *Mortimer* and *Baker* require "gross negligence" as an applicable standard by which an officer and director may be held liable. Assuming that the defendant can only be held liable under a standard of gross negligence, this Court finds and concludes that the acts and conduct of the defendants jointly and severally constitute, at a minimum, gross negligence. In actuality, the conduct of the defendants surpassed any standard of negligence and, in truth, was intentional, wanton, capricious and reckless. The parties have failed to perform their duties honestly, in good faith, or with any reasonable amount of diligence or care.

## SUMMARY OF DAMAGES

Volumes of figures, receipts, checks, and information have been received into evidence. Among this evidence is a certified copy of the IRS form 4621, known as Report of Examination–Exempt Organizations (the Report). The Report, which covers the fiscal years ending in 1984, 1985, 1986 and 1987, was admitted into evidence under the provisions of Rule 803(8), Federal Rules of Evidence. The IRS has had agents at PTL on a full time basis for the past two and one-half to three years studying PTL's records, receipts, disbursements, miscellaneous papers, operations, and other pertinent matters and has had as many as twelve agents at one time working on the case. The IRS report was made for the purpose of supporting the IRS position that PTL's tax exempt status should be revoked. The conclusions and opinions set forth in the Report are not binding on the Court in this case; however, the Report contains compilations of factual findings which serve as support and backup information for the summaries set out in the Report. The IRS investigator in charge of this examination testified extensively as to where the information came from and how it was obtained. The Court has found the findings and data compilations in this report generally to be accurate and trustworthy.

The following is a recitation of the damages determined to be owed to PTL by the defendants:

### A. *James O. Bakker*

■ Chart # 2 below is a chart containing information from the Report. This chart depicts benefits received by James Bakker which the IRS considered as being inurements to James Bakker over and above what they considered to be reasonable compensation to be received from a tax exempt organization. For the sake of clarity, the Court has taken this chart and parallelled its own findings with those in the Report. IRS figures are identified as

columns 1 through 4; the Court's findings are identified as columns A through D, and certain differences between the figures in the Report and the Court's findings are based on other evidence presented by the Trustee which justifies a modification from the Report. After studying all of the facts in light of the circumstances in this case, the Court finds that the columns designated as the Court's findings are the amounts which should be attributed as having been received from PTL by James Bakker. The Trustee has withdrawn any contentions as to any amount to be charged against James Bakker in lines 5, 7, 8, 9, 11 and 12, and therefore N/A appears in those columns. The figures in line 1, 2, 3 and 4 are found by the Court to be proper charges against James Bakker's receipts or benefits. Line 6 for Parsonage Utilities as entered by the IRS under all columns is found to be reasonably correct by the Court by reducing it one-half, because of the fact that the Trustee deleted line 7 which contains a housekeeping and maintenance allowance adequate to cover the utilities. The personal use of the aircraft in line 10 is properly charged to James Bakker and is recognized. All other entries in the Report are recognized as sufficiently proven by the Trustee, including reasonable compensation as contained in line 23 of the report. Compensation, as contained in line 23, includes salary and bonuses and normal benefits. Experts have testified that the normal salary of a minister would run from $75,000 to $120,000. The Court finds that the amount set forth in columns A, B, C, and D of line 23, are reasonable and appropriate amounts of compensation for James O. Bakker for the period in question. Credible experts in this field who testified for the Trustee indicated that bonuses were almost unheard of in the religious field, although fringe benefits would amount to about 30% of the salary.

The total payment in Line 24 to James Bakker which totals $6,738,762.57 for the four years, should have a *deduction* of $185,049.66 for the refund from the Jessica Hahn Trust as recovered by the Trustee in another adversary action. Additionally, James Bakker has presented evidence of possible reimbursements to PTL of $72,775.61. The Court will grant him full credit for that amount.

A comparison of Chart # 2 with Chart # 3, infra, pertaining to David Taggart, will reflect certain charges in common. These are as follows:

| | |
|---|---:|
| American Express—1984 | $ 165,249.52 |
| American Express—1985 | 45,934.97 |
| Cash Advance—MC & Visa—1986 | 309,520.89 |
| Cash Advance—MC & Visa—1987 | 300,048.55 |
| Other Expenditures—1985 | 378,280.47 |
| Other Expenditures—1986 | $ 355,660.50 |
| Total | $1,554,694.90 |

This total amount of $1,554,694.90 is a potential common liability of James Bakker and David Taggart which will be dealt with by separate additional findings set forth below and will not be included in the judgment to be issued against James Bakker individually.

Accordingly, this would make a net total of $4,926,242.40 due the Trustee, and the Trustee should have judgment against James Bakker individually for that amount with interest from the date of this Judgment until paid, at the legal rate of interest as provided for by the Rules in the United States District Court.

### B. *David A. Taggart*

Chart # 3 is formatted similarly to the inurement schedule set forth in the Report and is a calculation of this Court's findings as to reasonable compensation and overpayment to David Taggart during the years indicated where he was a vice president and administrative assistant to James Bakker. His functions, relations, duties and conduct are described earlier. The Court accepts the Trustee's evidence, including the IRS figures, with modifications. However, there should be added to that amount the $75,515.79 which is not included in the Report representing a PTL Certificate of Deposit pledged to the Rock Hill National Bank to secure a personal note made by David Taggart. Additionally, another $140,000.00 should be added for disbursements made in 1987 to his personal American Express account. As was indicated above, there is a total of $1,554,694.90 which is a potential common liability

of David Taggart and James Bakker. This item will be addressed separately below. This would make a net total of $1,048,-175.05, which is due the Trustee and the Trustee should have judgment against David Taggart individually for that amount with interest from the date of this judgment until paid at the legal rate of interest as provided for by 28 U.S.C. § 1961.

CHART #2
JAMES O. BAKKER

| DESCRIPTION | NOTES | 1984 Column #1 Findings of IRS | 1984 Column A Findings of COURT | 1985 Column #2 Findings of IRS | 1985 Column B Findings of COURT | 1986 Column #3 Findings of IRS | 1986 Column C Findings of COURT | 1987 Column #4 Findings of IRS | 1987 Column D Findings of COURT |
|---|---|---|---|---|---|---|---|---|---|
| Salary | 1 | 228,486.16 | 228,486.16 | 291,425.28 | 291,425.28 | 264,996.00 | 264,996.00 | 278,158.00 | 264,999.96 |
| Bonuses | 2 | 640,000.00 | 640,000.00 | 450,000.00 | 400,000.00 | 600,000.00 | 600,000.00 | 1,167,000.00 | 1,040,000.00 |
| Housing Allowance | 3 | 24,000.00 | 24,000.00 | 24,360.00 | 24,480.00 | 25,440.00 | 25,440.00 | 23,320.00 | 25,440.00 |
| Minister's Benefit Assn. | 4 | 108,468.75 | 108,468.75 | 123,429.20 | 123,429.20 | 132,500.04 | 132,500.04 | 121,458.36 | 132,500.04 |
| FRV of Parsonage | 5 | 45,000.00 | 45,000.00 | 45,000.00 | N/A | 45,000.00 | N/A | 45,000.00 | N/A |
| Parsonage Utilities | 6 | 17,563.15 | 8,781.57 | 21,596.24 | 10,798.12 | 23,996.97 | 11,558.49 | 25,472.66 | 12,736.23 |
| Housekeeping/Maint. | 7 | 27,696.76 | N/A | 27,696.76 | N/A | 27,696.76 | N/A | 27,696.76 | N/A |
| FRV of Florida Condo. | 8 | 24,000.00 | N/A | 2,000.00 | N/A | 0.00 | N/A | 0.00 | N/A |
| Condo. Utilities | 9 | 924.78 | N/A | 150.41 | N/A | 0.00 | N/A | 0.00 | N/A |
| Personal Use Aircraft | 10 | 0.00 | 0.00 | 102,460.76 | 102,460.76 | 0.00 | 0.00 | 0.00 | 0.00 |
| Personal Use of Auto | 11 | 1,200.00 | N/A | 4,200.00 | N/A | 4,800.00 | N/A | 17,255.32 | N/A |
| Personal Use of Pres. Suite, Heritage Grand Hotel | 12 | 0.00 | N/A | 108,000.00 | N/A | | N/A | | N/A |
| Expend for Personal Benefit of Bakker from Exec. Chk. | 13 | 0.00 | 0.00 | 33,340.25 | 21,340.25 | 46,197.39 | 46,197.39 | 50,463.41 | 50,463.41 |
| Parsonage Chk. Acct. | 14 | 5,000.00 | 0.00 | 16,500.00 | 3,500.00 | 134,723.06 | 127,723.00 | 480,595.11 | 479,000.00 |
| General Chk. Acct. | 15 | 30,000.00 | 0.00 | 81,264.03 | 33,264.03 | 38,198.88 | 13,298.88 | 0.00 | 0.00 |
| Write-off of Cash Adv. | 16 | 0.00 | 0.00 | 14,590.26 | 5,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Cash Adv.-MC & VISA | 17 | 9,000.00 | 9,000.00 | 0.00 | 0.00 | 309,520.89 | 309,520.89 | 300,048.55 | 300,048.55 |
| Amer. Express Charges | 18 | 178,616.41 | 178,616.41 | 47,458.97 | 47,458.97 | 0.00 | 0.00 | 0.00 | 0.00 |
| Exec. Air Fleet Pymts. | 19 | 0.00 | 0.00 | 124,986.23 | 124,986.23 | 0.00 | 0.00 | 36,919.99 | 36,919.99 |
| J. Hahn Related Pymts. | 20 | 0.00 | 0.00 | 38,700.00 | 38,700.00 | 0.00 | 0.00 | 325,000.00 | 325,000.00 |
| Other Expenditures | 21 | 0.00 | 0.00 | 378,280.47 | 378,280.47 | 355,660.50 | 355,660.50 | 0.00 | 0.00 |
| Total for Bakker's Benefit | 22 | 1,339,956.01 | 1,197,352.89 | 1,935,438.86 | 1,605,123.31 | 2,008,730.49 | 1,886,895.19 | 2,898,388.16 | 2,667,108.18 |
| Less: Reasonable Comp. | 23 | (133,100.00) | (133,100.00) | (146,410.00) | (146,410.00) | (161,051.00) | (161,051.00) | (177,156.00) | (177,156.00) |
| Inurement to J. Bakker | 24 | 1,206,856.01 | 1,064,252.89 | 1,789,028.86 | 1,458,713.31 | 1,847,679.49 | 1,725,844.19 | 2,721,232.16 | 2,489,952.18 |

**IRS FINDINGS (Columns 1, 2, 3, 4)**

| | |
|---|---|
| Total of Line 22 | $8,182,513.52 |
| Less: Total of Line 23 | 617,717.00 |
| Total of Line 24 | $7,564,796.52 |

**COURT FINDINGS (Columns A, B, C, D)**

| | |
|---|---|
| Total of Line 22 | $7,356,479.57 |
| Less: Total of Line 23 | 617,717.00 |
| Total of Line 24 | $6,738,762.57 |
| - 185,049.66 | (Hahn Recovery) |
| - 72,775.61 | (Reimbursements Proved) |
| $6,480,937.30 | |
| - 1,554,694.90 | (Potential Joint Liability) |
| $4,926,242.40 | |

CHART # 3

DAVID A. TAGGART

| Description | Notes | 8405 | 8505 | 8605 | 8705 |
|---|---|---|---|---|---|
| Salary | (1) | 50,662.08 | 107,693.39 | 98,297.29 | 82,592.99 |
| Bonuses | (2) | 10,000.00 | 31,881.00 | 111,745.00 | 523,380.00 |
| Expend. for Personal Benefit of Taggart from Exec. Check. | (3) | 0.00 | 18,720.16 | 42,225.16 | 84,043.61 |
| Parsonage Check Acct | (4) | 1,948.73 | 8,832.90 | 14,000.00 | 0.00 |
| General Checking | (5) | 20,000.00 | 4,000.00 | 0.00 | 0.00 |
| Unsubstan. Cash Advance | (6) | 6,500.00 | 82,807.55 | 0.00 | 0.00 |
| Cash Adv–M.C. & VISA | (7) | 6,398.71 | 0.00 | 309,520.89 | 300,048.55 |
| Amer. Express Charges | (8) | 165,249.52 | 45,934.97 | 0.00 | 0.00 |
| Exec. Air Fleet Pymts | (9) | 0.00 | 0.00 | 11,537.62 | 21,426.27 |
| Other Expenditures | (10) | 0.00 | 378,280.47 | 355.660.50 | 0.00 |
| Total for Taggart's Benefit | | $260,759.04 | $678,150.44 | $942,986.46 | $1,011,-491.42 |
| Less: Reasonable Comp. | | (69,878.00) | (131,769.00) | (144,946.00) | (159,440.00) |
| Inurement to D. Taggart | | $190,881.04 | $546,381.44 | $798,040.46 | $ 852,051.-42 |

Chart Total: $2,387,354.36
Plus: 75,515.59 (Rock Hill National Bank Note)
Plus: 140,000.00 (Personal American Express Payments)
Less: (1,554,694.90) (Potential Joint Liability)

Total $1,048,-175.05

## C. *Tammy Faye Bakker*

■ Chart # 4 is formatted similarly to the inurement schedule set forth in the Report and is a calculation of this Court's findings as to the reasonable compensation and overpayment to Tammy Faye Bakker during the years in question. Although Tammy Faye Bakker indicated that she was not aware of amounts of compensation and bonuses, she did receive them and therefore is accountable to PTL for reimbursement to the extent that payments were improper and unjustified.

Although the Trustee's evidence as to the reasonableness of compensation for Tammy Faye Bakker would support findings of far lesser amounts, the Court has determined that, in light of the duties performed, the responsibilities of her position, and adjusting for inflation and general raises, reasonable compensation for Tammy Faye Bakker from all PTL sources for the years in question should have been as follows:

| 1984 | $119,790.00 |
| 1985 | $131,769.00 |
| 1986 | $144,946.00 |
| 1987 | $159,440.00 |

During the time in question, Tammy Faye Bakker was an insider and a person in control of PTL. During that same period of time, James Bakker was acting as her agent in obtaining overgenerous compensation for her. To allow Tammy Faye Bakker to retain the benefit of this overwhelming largess would be to allow her to be unjustly enriched at the expense of the corporation and its creditors. Consequently, of the $1,233,342.07 she received over this four year period, only $555,945.00 was justifiable under the most expansive definitions of reasonability. Consequently, the Trustee is entitled to recover of Tammy Faye Bakker for the benefit of the estate the sum of $677,397.07, together with interest from the date of entry of the judgment until paid, with interest to be computed pursuant to the provisions of 28 U.S.C. § 1961.

CHART # 4
Tamara Faye Bakker

| Description | Notes | 8405 | 8505 | 8605 | 8705 |
|---|---|---|---|---|---|
| Salary | (1) | $ 84,963.91 | $142,586.04 | $ 83,174.63 | $ 92,478.96 |
| Bonuses | (2) | 130,000.00 | 115,000.00 | 200,000.00 | 336,000.00 |
| Expenditures for the Benefit of Tammy Faye Bakker | | | | | |
| Exec. Check. Acct. | (3) | | 5,000.00 | 7,184.00 | 31,955.03 |
| Parsonage Check Acct | (4) | 6,000.00 | | | |
| Total for T. Bakker's Benefit | | $220,963.41 | $262,586.04 | $290,358.63 | $459,433.99 |
| Less: Reasonable Comp. | | 119,790.00 | 131,769.00 | 144,946.00 | 159,440.00 |
| Inurement to T. Bakker | | $101,173.41 | $130,817.04 | $145,412.63 | $299,993.99 |
| Total | | $677,397.07 | | | |

### D. *Joint and Several Liability of James Bakker and David Taggart.*

■ As was indicated above, there is a total charge of $1,554,694.90, which includes American Express charges, cash advances on Master Card and Visa accounts and other expenses, which, based on the Trustee's evidence, would be the joint liability of both James Bakker and David Taggart. Although the Court has carefully reviewed the record and finds the Trustee's evidence to be credible, in order to give these parties every imaginable benefit of the doubt, the Court herewith finds that James Bakker and David Taggart are liable to the estate, jointly and severally, for these items in at least an amount equal to $1,036,000. Consequently, in addition to the individual judgments to be rendered against the two male defendants as set forth above, an additional judgment evidencing the joint and several liability of James Bakker and David Taggart will be entered in the amount of $1,036,000, together with interest from the date of entry of the judgment until paid, with interest to be computed pursuant to the provisions of 28 U.S.C. § 1961.

### DEFENDANTS' CLAIMS AGAINST THE ESTATE

■ The defendants, James O. Bakker and Tammy Faye Bakker, have filed a claim in this proceeding for "$1.3 million plus". The Bakkers assert that they are entitled to the value of their former residence known as Tega Cay No. 1 and they further assert that they have rights to copyrights, trademarks, and other intangibles. Although the board of directors of PTL on April 2, 1986 indicated some desire to, at some point in time, convey to the Bakkers the parsonage known as Tega Cay No. 1, no further action was ever taken either by the board of directors or anyone else on behalf of PTL to consummate that transaction. Accordingly, as of the time of the filing of the present proceeding, record title was still vested in PTL and the Bakkers have demonstrated no right whatsoever to either the parsonage or its value. The Trustee has a superior claim to title to the property pursuant to Section 544 of the Bankruptcy Code (11 U.S.C. § 544.) As to any rights which the Bakkers might assert to copyrights, trademarks, and other intangibles, time and time again the Bakkers made representations to the general public that all such rights that they might have been assigned to and were the property of PTL. The Court has no basis upon which to make any finding to the contrary.

■ David A. Taggart has filed with the Court a proof of claim based on a purported employment contract. Based on this contract, David A. Taggart seeks recovery of the sum of $187,500.00. There is no indication anywhere on the record that the president of PTL or the chief operations officer of PTL or the board of directors of PTL were at any time aware of the existence of such a contract. This contract is yet another example of how David Taggart had regularly taken advantage of his position to obtain benefits fraudulently for himself. In December 1985 he engaged a lawyer in Charlotte to prepare an employ-

ment contract between himself and PTL. The contract was prepared by the lawyer and sent to David Taggart. It was signed by David Taggart, as employee, and by Shirley Fulbright and Peter Bailey for PTL. Peter Bailey did not have the authority to set Taggart's salary; that was in the hands of James Bakker or Richard Dortch. Peter Bailey did not recall whether he signed the contract or not and didn't recognize his signature, but a handwriting expert testified that it was his signature. The employment contract is a sham as far as PTL is concerned. It is the basis for David Taggart's claim asking for a year's termination salary. The only purpose advanced by Taggart for this contract was that a formal employment agreement was needed to furnish the lender who was proposing to make a loan to David Taggart to purchase a condominium in Trump Towers in New York City, but the contract turned out to have a further fraudulent purpose. There was a clause in the contract which provided that any taxes that were assessed against Taggart for his PTL salary would be paid by PTL. For the fiscal year 1981–1982, Taggart's income as reported on his W–2 form from PTL was found by the IRS to be grossly inadequate. Taggart was assessed with another $150,000 in taxes, interest, and penalties for that year. Taggart, using the contract, caused PTL to pay him the amount of the tax. The contract, even if assumed to be valid, contained no provision for payment of taxes for employment prior to its signing. The Trustee's objection to the claim of David A. Taggart must be sustained.

## REMAINING CLAIMS OF THE TRUSTEE

In the Trustee's counterclaim which was filed on February 1, 1988, there was an assertion of a claim against James O. Bakker and David A. Taggart premised on PTL's potential liability to the IRS. At this juncture, the issue of the amount of the claim of the IRS to be allowed in this proceeding is still pending and will be determined in the adversary proceeding styled *In re: Heritage Village Church and Missionary Fellowship, Inc., a/k/a PTL, PTL Club, Fort Heritage Campgrounds and Christian Retreat, PTL Enterprises, Debtor; M.C. Benton, Jr., Trustee, Plaintiff vs. United States of America, et al., Defendants.* Since the Trustee did not offer evidence to support his allegation in regard to any liability on the part of James Bakker or David Taggart for the possible IRS tax levy, it was not considered in this proceeding as having any merit.

Also, there was much evidence with regard to mismanagement of the corporation for imposing liability on James Bakker and David Taggart; however, general damages to PTL resulting from mismanagement was not pursued aggressively enough to determine the amount of liability. It was well understood that there might be a valid reason for this position taken by the Trustee in that pursuing additional recovery against the parties might "throw good money away for bad". In other words, would there be any chance of collecting the excessive amount over and above what's herein allowed, if recovery should be had? Therefore the benefit of the doubt is being given to defendants Bakker and Taggart for additional liabilities.

## CONCLUSION

In conforming with the religious overture of this case, this Court observes that James Bakker either overlooked or ignored parts of the Bible including I Timothy 6:10 —"For the love of money is the root of all evil: which while some coveted after, they have erred from the faith and pierced themselves through with many sorrows". Now, however, we must apply Galatians 6:7—"Be not deceived; God is not mocked: for whatsoever a man soweth, that shall he also reap".

Let judgments be entered pursuant to this Memorandum Opinion.