In re HERITAGE VILLAGE CHURCH AND MISSIONARY FELLOWSHIP, INC., a/k/a PTL, PTL Club, PTL Television Network, Fort Heritage Campgrounds and Christian Retreat, PTL Enterprises and Heritage U.S.A., Debtor.

Carroll BONNER, Arnold Santjer, and Joe Takacs, as Individual Lifetime Partners on Behalf of the Lifetime Partners of PTL, Plaintiffs,

v.

M. Joseph ALLMAN, Successor Trustee for the Debtor, Heritage Village Church and Missionary Fellowship, Inc., a/k/a PTL, PTL Club, PTL Television Network, Fort Heritage Campgrounds and Christian Retreat, PTL Enterprises and Heritage U.S.A., United States of America, Nicholas Brady, Secretary of the

Department of the Treasury, and Lawrence B. Gibbs, Commissioner of the Internal Revenue Service, the South Carolina Tax Commission, and the Unsecured Creditors' Committee, Defendants.

Bankruptcy No. 87–01956.
Adv. No. 88–0182.

United States Bankruptcy Court,
D. South Carolina.

Nov. 4, 1991.

David H. Conaway, K. Todd Phillips, Blair Conaway Bograd & Martin, Charlotte, N.C., for plaintiff.

R. Bradford Leggett, M. Joseph Allman, Allman Spry Humphreys Leggett & Howington, P.A., Winston–Salem, N.C., for trustee/defendant.

Richard F. Mitchell, U.S. Dept. of Justice, Washington, D.C., for U.S.

Arlene D. Hand, Asst. Atty. Gen., S.C. Tax Com'n, Columbia, S.C., for South Carolina Tax Com'n.

Robert N. Robinson, Charlotte, N.C., for Unsecured Creditors Committee.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

WILLIAM THURMOND BISHOP, Bankruptcy Judge.

This matter came on for hearing, after proper notice, upon the Motion of Defen-

dant M. Joseph Allman, Trustee For the Debtor, Heritage Village Church, Inc. a/k/a PTL For Summary Judgment ("Trustee's Motion") seeking a determination from the Court that, as a matter of law, the Plaintiff class of Lifetime Partners are not entitled to the status of 11 U.S.C. § 507(a)(6) priority creditors in this bankruptcy proceeding. The Trustee's Motion was filed with the court on August 9, 1991. On or about August 21, 1991 the South Carolina Tax Commission filed with the Court its Concurrence With the Trustee's Motion. On August 30, 1991 the Official Committee of Unsecured Creditors filed its Concurrence With the Trustee's Motion. No pleading has been filed by the United States Justice Department on behalf of the Internal Revenue Service with respect to the Trustee's Motion. On or about September 6, 1991, the Plaintiffs filed Plaintiffs' Brief in Opposition to Trustee's Motion For Summary Judgment and Plaintiffs' Statement of Undisputed Material Facts in Opposition to Trustee's Motion For Summary Judgment. On September 18, 1991 the Trustee filed Trustee's Response to Plaintiff's Brief in Opposition to Trustee's Motion For Summary Judgment.

Oral arguments on the Trustee's Motion were held before the Court on September 19, 1991. After reviewing the Trustee's Motion, the subsequent pleadings made by the parties with respect thereto, the official Court file in this adversary proceeding, and hearing the arguments of the party, the Court rules as follows:

## PROCEDURAL BACKGROUND

On June 12, 1987, Heritage Village Church and Missionary Fellowship, Inc. a/k/a PTL filed for protection under Chapter 11 of Title 11 of the United States Code. On November 2, 1987, Dr. David W. Clark was appointed Trustee in this proceeding. On May 20, 1988 M.C. Benton, Jr. was appointed successor Trustee and served in that capacity until March 12, 1990 when Dennis W. Shedd was appointed as successor Trustee. On January 22, 1991 Dennis W. Shedd resigned as Trustee and M. Joseph Allman was appointed as successor Trustee in this proceeding and continues to serve in that capacity.

On June 30, 1988 the Official Committee of Lifetime Partners, Carroll Bonner, Arnold Santjer, and Joe Takacs, as individual Lifetime Partners on behalf of the Lifetime Partners of PTL, instituted this adversary proceeding as Plaintiffs against M.C. Benton, Jr., the Trustee's predecessor, seeking certification of a class consisting of the Lifetime Partners of PTL and further, seeking declaratory relief adjudicating that the members of said class are subject to priority treatment in this bankruptcy proceeding as 11 U.S.C. § 507(a)(6) deposit creditors.

On August 18, 1988, an Order was entered by the Court allowing the Plaintiffs to amend their complaint for the purpose of adding The United States of America, the South Carolina Tax Commission, and the Official Unsecured Creditors Committee as additional party Defendants to the action. This Amendment did not modify the relief sought by the Plaintiffs in the original complaint but rather was done to assure that all groups which would be adversely affected by a ruling in favor of the class of Lifetime Partners would be represented in the adversary proceeding.

On October 25, 1988 the Court entered an Order allowing the individual Plaintiffs to serve as representative parties for all Lifetime Partners of PTL and, as such, certified this adversary proceeding as a class action under Bankruptcy Rule 7023 and Rule 23(b), Federal Rules of Civil Procedure. On December 23, 1988 the Court granted the Motion of The United States and dismissed the Official Lifetime Partners Committee as a party plaintiff in this action, without affecting the certification of Lifetime Partners of PTL as a class in this adversary proceeding.

## THE LIFETIME PARTNERSHIPS

Throughout the history of its operations, the Debtor, primarily through its former President, James O. Bakker,[1] engaged in

---

1. For background concerning the relationship of James O. Bakker and the Debtor Corporation,

what is known in the tele-evangelism industry as "premium driven" fund raising. This technique involves the furnishing of an incentive for contributors to make donations, typically in the form of a promise of a return gift following the donation. Historically, Bakker represented that items such as books, records, tapes or other religious memorabilia would be distributed to the donor after gifts were made in the requisite amounts.

In December, 1983, Bakker initiated a new "premium driven" fund raising concept known as "PTL Lifetime Partners". The stated purpose of this fund raising drive was to generate funds with which to construct the PTL Partner Center, including The Heritage Grand Hotel, Main Street, U.S.A., and accompanying conference facilities. According to the solicitations, rather than borrowing funds from normal sources, Bakker was going to raise funds by the solicitation of donations of One Thousand Dollars ($1,000.00) from persons who were then denominated Lifetime Partners. In return for such a gift made to PTL, Bakker promised that the donor (or investor) would receive certain benefits as a partner, the most typical of which was an opportunity to stay for four days and three nights each year at a lodging facility at Heritage USA for life.

Bakker formulated a variety of Lifetime Partner programs to solicit donations ranging in amounts from Five Hundred Dollars ($500.00) to Ten Thousand Dollars ($10,-000.00). Lifetime Partners numbered in excess of one hundred fourteen thousand (114,000) individuals, and donations from various Lifetime Partner Programs generated more than One Hundred Sixty Million Dollars ($160,000,000.00) in revenue for the Debtor. Funds generated as a result of Lifetime Partner donations were not segregated by the Debtor for construction endeavors but rather, were used to pay on going operational expenses and for other purposes.

Throughout the promotional literature utilized by Bakker to solicit Lifetime Partner donations, the Debtor always characterized Lifetime Partnership donations as "gifts" or "investments". In fact, the Plaintiffs have neither demonstrated nor shown to the Court any solicitations made by the Debtor which describe or refer to Lifetime Partnerships as "deposits". Further, Lifetime Partners were also consistently advised that utilization of Lifetime Partner benefits was "dependent upon room availability." Lifetime Partners were assured neither of the usage of a particular unit or room, nor of the availability of any room with which to utilize their benefits. Indeed, due to the large number of Lifetime Partners, many partners could not obtain reservations, except for years in advance or at inconvenient times. However, the undisputed testimony of Plaintiff class representative Joseph Takacs, established that at least certain members of the class were delivered or provided a value from their Lifetime Partnerships in excess of the amount paid.

Bakker's solicitations detailed the value of Lifetime Partnerships as investments and, in fact, one of Bakker's promotional literature represented that a One Thousand Dollars ($1,000.00) donation had an investment value of Twenty Thousand Dollars ($20,000).

In the Spring of 1987, prior to the commencement of this bankruptcy case, the management of the pre-petition Debtor concluded that the solicitation of Lifetime Partnerships was inappropriate due to the obvious inability of the Debtor to fulfill representations made to the Lifetime Partners and as such, all Lifetime Partner solicitations were terminated.

## PROCEDURE FOR DISPOSITION OF ISSUE

Summary judgment is no longer regarded as a disfavored procedural shortcut; it is a salutary method of disposition "designed 'to secure the just, speedy and inex-

see *M.C. Benton, Jr., Trustee v. James O. Bakker, Tammy Faye Bakker and David A. Taggart,* 92 B.R. 1000 (Bkrtcy.D.S.C.1988) aff'd C/A No.

0:89–81–16 (D.S.C. October 26, 1990); aff'd 944 F.2d 901, 944 F.2d 902 (4th Cir.1991)

pensive determination of every action'." *Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.*, 833 F.2d 1560 (Fed.Cir. 1987), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rule 56(c), Federal Rules of Civil Procedure, provides as follows:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

As represented by counsel for the Plaintiffs and the Trustee, the basic facts giving rise to this controversy, as set forth in the pleadings filed with respect to the Trustee's Motion, are not disputed. The issue before the Court is whether, as a matter of law, the Plaintiffs are subject to treatment as priority deposit creditors under 11 U.S.C. § 507(a)(6). This issue therefore is ripe for adjudication under Rule 56, Federal Rules of Civil Procedure, and Rule 7056, Rules of Bankruptcy Procedure.

 An underlying presumption in the administration of bankruptcy cases is that a debtor's limited resources will be equally distributed among creditors, and, consequently, statutory priorities must be narrowly construed. See *In re James B. Downing & Co.*, 94 B.R. 515, 519 (Bankr. N.D.Ill.1988); *In re American International Airways, Inc.*, 70 B.R. 102, 104 (Bankr.E.D.Pa.1987). Further, the burden to demonstrate that the requisite elements for a priority status are met rests upon the claimants. See *In re Electronic Theater Restaurants, Inc.*, 85 B.R. 45, 47 (Bankr. N.D.Oh.1988). Accordingly, the provisions of 11 U.S.C. § 507(a)(6) must be narrowly construed in making a determination concerning the Plaintiffs' entitlement to priority status thereunder.

### STATUTORY CONSTRUCTION AND LEGISLATIVE HISTORY

 During the course of oral argument on the Trustee's Motion for Summary Judgment, it became apparent that the linchpin of the Plaintiff's position was reliance upon the reference in the legislative history of § 507(a)(6) to consumers who buy "a service contract or a contract for lessons or a gym membership." On the other hand, the Trustee maintained that, the legislative history notwithstanding, the provisions of § 507(a)(6) are not only unambiguous, but also contain very specific limiting phrases which serve to exclude the class of Lifetime Partners from eligibility as deposit creditor priority claimants. The two (2) limiting phrases are "arising from the *deposit* ... of money," and "that were not delivered or provided." (Emphasis added.) In context, 11 U.S.C. § 507(a)(6) provides as follows:

> (6) Sixth, allowed unsecured claims of individuals, to the extent of $900 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

The Plaintiffs have urged that this statute be interpreted in light of the legislative history relating to § 507(a)(6) which is, in pertinent part, as follows:

### C. CONSUMER CLAIMS

The fifth priority[2] under H.R. 8200 is new. It has been added as a result of testimony before the Subcommittee on Civil and Constitutional Rights concerning the problems that consumers have encountered with bankrupt retail businesses with whom the consumers have deposited money for goods and services.

The bill gives a priority in the distribution of assets of a bankrupt debtor to consumers who have deposited or made partial payments for the purchase or lease of goods, or the purchase of services, that were not delivered or provided. The priority comes after administrative expenses and wages, but before taxes.

---

**2.** As originally executed, the deposit creditor priority was designated § 507(a)(5).

There is no similar provision in current law.

A consumer that pays money on a lay-away plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or a gym membership, is a general unsecured creditor of the business to which he has given his money. Very few consumers are aware of their status as general unsecured creditors. If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag. Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors. Because of his ignorance and his inability to bargain with a retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. A recent example is the W.T. Grant bankruptcy. All customers who held "Grant's script" have essentially lost their deposits.

As held in the case of *Doski v. M. Goldseker Co.*, 539 F.2d 1326 (4th Cir.1976), the general rule of statutory construction is as follows:

We believe what the Supreme Court stated in *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961), is fully applicable here:

Having concluded that the provisions of [the statute] are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act. Since the State has placed such heavy reliance upon that history, however, we do deem it appropriate to point out that this history is at best inconclusive.

(Footnotes omitted.) Similarly, we have stated that " '[w]e do not think it permissible to construe a statute on the basis of a mere surmise as to what the Legislature intended and to assume that it was only by inadvertence that it failed to state something other than what it plainly stated.' " *United States v. Deluxe*

*Cleaners and Laundry, Inc.*, 511 F.2d 926, 929 (4th Cir.1975).

539 F.2d at 1332.

This standard of review was reiterated by the Fourth Circuit in its opinion in *In re Moore*, 907 F.2d 1476 (4th Cir.1990), which dealt with an interpretation of the phrase "applicable nonbankruptcy law" as contained in § 541(c)(2) of the Bankruptcy Code. After considering arguments that reference to the legislative history should be made in interpreting § 542(c)(2), the Court held:

An appeal to legislative history is inappropriate here because the language of § 541(c)(2) is clear. "Legislative history is irrelevant to the interpretation of an unambiguous statute." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989). "Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.' " *Burlington Northern R.R. v. Oklahoma Tax Commission*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). Congress enacted § 541(c)(2), not its accompanying legislative reports. We have no authority to limit the scope of a clear statutory term by recourse to the views of a legislative subgroup.

907 F.2d at 1478–79.

The analysis that the Plaintiffs request in the situation pending before the Court is the reverse of the situation which usually gives rise to a party's seeking recourse to legislative history. The usual situation occurs when the terms or scope of a statute are sought to be expanded beyond the literal terms of the statute, because there is an *absence* of definition within the statute itself. Here, on the other hand, the Plaintiffs seek an interpretation which ignores very specific and very limiting phrasing already contained in the statute. The Plaintiffs are, by the use of the legislative history, attempting to create an ambiguity where one does not exist. As indicated in

*United States v. Blasius,* 397 F.2d 203 (2nd Cir.1968):

> The proper function of legislative history is to solve and not to create an ambiguity, *Railroad Commission of State of Wisconsin v. Chicago, B. & Q.R. Co.,* 257 U.S. 563, 589, 42 S.Ct. 232, 66 L.Ed. 371 (1922); *Commissioner of Internal Revenue v. Estate of Ridgeway,* 291 F.2d 257, 260 (3rd Cir.1961); *Montgomery Charter Serv., Inc. v. Washington Metropolitan Area Transit Commission,* 117 U.S.App.D.C. 34, 325 F.2d 230, 233 (1963).

397 F.2d at 206.

The use of legislative history in statutory analysis should be limited in a manner as indicated in the following quotes from two recent United States Supreme Court cases. The first is found in the opinion entered in the case of *Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), which held as follows:

> Moreover, and more generally, the language of a statute ... is not to be regarded as modified by examples set forth in the legislative history. An example, after all, is just that: An illustration of a statute's operation in practice. It is not, as the Court of Appeals apparently thought, a definitive interpretation of a statute's scope.

110 S.Ct. at 2677.

Secondly, in *West Virginia University Hospitals, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), it was held:

> [T]he purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone. See *Rodriguez v. United States,* 480 U.S. 522, 525–526, 107 S.Ct. 1391, 1391–1394, 94 L.Ed.2d 533 (1987). The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous— that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process. See *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms.'"), quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

111 S.Ct. at 1147.

The general rule of statutory interpretation, with or without reference to legislative history, was addressed in the Fourth Circuit opinion of *Vroon v. Templin,* 278 F.2d 345 (4th Cir.1960), which held that:

> The language of the statute is plain and is to be taken as written. We do not think it permissible to construe a statute on the basis of a mere surmise as to what the Legislature intended and to assume that it was only by inadvertence that it failed to state something other than what it plainly stated. This is particularly true when there is no confusion or lack of clarity in the wording of the statute and where it could so easily have been worded to provide the meaning given by the District Court had the lawmaking body so desired.

278 F.2d at 348–349.

The *Vroon* case dealt with the interpretation of a Virginia statute. However, the rationale was later applied by the Fourth Circuit to an interpretation of a federal statute in *United States v. Deluxe Cleaners and Laundry, Inc.,* 511 F.2d 926, 929 (4th Cir.1975).

The case of *Rivera v. Becerra,* 714 F.2d 887 (9th Cir.1983), involved a situation in which the legislative history (created by the Senator who offered the amendment in question) was contrary to the wording of the amendment as enacted. In determining that a Senator's statement could not replace the interpretation compelled by the statutory language, the Court held:

> "The best indicator of what statutory words mean is what they say." *Finnegan v. Matthews,* 641 F.2d 1340, 1344 (9th Cir.1981). Determining the meaning

of a statute from its legislative history is "a step to be taken cautiously," *Piper* [*v. Chris–Craft Industries*], 430 U.S. [1] at 26, 97 S.Ct. [926] at 941 [51 L.Ed.2d 124 (1977)], particularly when the meaning appears clear on the face of the statute. See *Church of Scientology v. United States Dept. of Justice*, 612 F.2d 417, 422 (9th Cir.1979).

Where, as here, there is no ambiguity in the statutory language, resort to the legislative history is usually unnecessary. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978); *United States v. Rone*, 598 F.2d 564, 569 (9th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

714 F.2d at 893.

The rationale for the foregoing was most appropriately identified by the Court in *Matter of Sinclair*, 870 F.2d 1340 (7th Cir. 1989), in an opinion dealing with a specific statutory provision of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, which had a legislative history indicating a result contrary to the express wording of the statute. The *Sinclair* Court held:

Which prevails in the event of conflict? The statute or its legislative history? The statute was enacted, the report just the staff's explanation. Congress votes on the text of the bill, and the President signed the text. Committee reports help the courts understand the law, but this report contradicts rather than explains the text. So the statute must prevail.

870 F.2d at 1341.

Statutes are law, not evidence of law. References to "intent" in judicial opinions do not imply that legislators' motives and beliefs, as opposed to their public acts, establish the norms to which all others must conform. "Original meaning" rather than "intent" frequently captures the interpretive task more precisely, reminding us that it is the work of the political branches (the "meaning") rather than of the courts that matters, and that their work acquires its meaning when enacted ("origi-nally"). Revisionist history may be revelatory; revisionist judging is simply unfaithful to the enterprise.

870 F.2d at 1342–43.

The Court concludes that § 507(a)(6) is unambiguous and clear as currently drafted and, consequently, the Court has accorded no weight to the legislative history in reaching the conclusions contained herein.

## THE ELIGIBILITY OF LIFETIME PARTNERS TO HAVE PRIORITY STATUS

■■■ In effect the Plaintiffs have urged the Court to rewrite and expand the provisions of § 507(a)(6) far beyond its literal limitations. If the Court were to accept the Plaintiffs' interpretation of the statute, the words "from the deposit ... of money" could simply be deleted from § 507(a)(6) entirely, and the statute would read as follows:

(6) Sixth, allowed unsecured claims of individuals, to the extent of $900 for each such individual, arising ~~from the deposit~~, before the commencement of the case, ~~of money~~ in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

However, this is not an appropriate function of the judiciary. The role of the Court is to interpret and apply the statutes adopted by the legislative branch and signed by the executive branch, not to undertake the legislative function itself, no matter how appealing that role might be in light of the sympathetic plight of the Plaintiffs. If this priority is to be changed from a *deposit* creditor priority to a *consumer* creditor priority, such a modification should be effected by Congress, not this Court.

Perhaps the result of the interpretation of § 507(a)(6) would be different if the Plaintiffs were urging an interpretation based on an omission of language from the statute; but here, the Court is being requested to disregard limiting phrases which have been included in the statute, and for good reason. The purpose of these limiting phrases is clear, particularly when considered in the current factual context.

■ The intention of § 507(a)(6), by the use of the term "deposit", is to provide a remedy for *pre-purchase defaults* by debtors in consumer transactions. Without question, the operative word contained in 11 U.S.C. § 507(a)(6) is "deposit", as the priority afforded by this statutory provision is specifically conditioned upon the making, by a consumer, of a "deposit" prior to commencement of the bankruptcy proceeding. "Deposit", as used in its ordinary and common usage is defined as follows:

"... (1) to lay aside; to lay down; to put; to place; as, a bird deposits her eggs in a nest. (2) to put or lay in a place for safekeeping or preservation; to store; as, to deposit goods in a warehouse. (3) to put (money) in the bank, as for safekeeping or to earn an interest. (4) to put down as a pledge or partial payment; as, they deposited $500.00 on a new house. (5) to leave lying, as sediment. (6) to lay aside; to get rid of."

*Webster's Deluxe Unabridged Dictionary*, 2d Edition (1979). In its usage in § 507(a)(6), the appropriate definition of deposit is that of "putting down as a pledge" or "partial payment."

These payments, solicited as gifts or investments and made by the Plaintiffs to the Debtor, do not fall under the definition of "deposit". Additionally, it is important to note that at the time of payment by Lifetime Partners, no deposit arrangement could have been contemplated by the parties. Instead, each Lifetime Partner's payment completely satisfied the partner's obligations to the Debtor with respect to the Lifetime Partnership. The relationship did not require further payments by Lifetime Partners and as such, did not constitute a deposit relationship. It was not contemplated that Lifetime Partners would be entitled to a specific hotel room, condominium, or unit on the premises nor, more importantly, were Lifetime Partners promised availability of rooms or any other benefits for the use of their partnership.

No one disputes that whatever rights Lifetime Partners may have possessed, be they memberships paid in full or on time, those rights were fully vested pre-petition. Payments made by Lifetime Partners, were not, in any sense of the word, deposits. The word deposit does not appear in any of the promotional literature attached as exhibits to either the Plaintiffs' or the Defendant's pleadings. Moreover, no trust relationship is alleged to have been created with respect to the Lifetime Partners' monies, nor have the Plaintiffs alleged that the Lifetime Partners' payments were, or should have been, segregated by the Debtor. In essence, the rights and responsibilities of individual Lifetime Partners and the Debtor were both fully operative and were being *delivered and provided* prior to the filing of the bankruptcy petition. The fact that the benefits of the Lifetime Partner memberships were being delivered and provided pre-petition is further cause to support a determination that the Plaintiffs fall without the literal purview of § 507(a)(6).

The language of 11 U.S.C. § 507(a)(6) is plain and unambiguous. For a claimant to be entitled to priority under this statute, the claimant must demonstrate that the claimant is a consumer who has made a deposit of money, pre-petition, for the purchase, lease or rental of property or services which were not delivered or provided. Plaintiffs are unable to demonstrate that "deposits" were made by the class of claimants. Further, the undisputed testimony of Plaintiff class representative Joseph Takacs demonstrates that Lifetime Partnership benefits were, in fact, delivered and provided before the commencement of the case. In light of the narrow manner in which 11 U.S.C. § 507(a)(6) must be construed, it is this Court's determination, as a matter of law, that the Plaintiffs' class of claimants are not entitled to priority status as 11 U.S.C. § 507(a)(6) creditors.

## CONCLUSION

For the reasons set forth above, the Motion of the Trustee for Summary Judgment is hereby granted.

AND IT IS SO ORDERED.