**In re WW WAREHOUSE, INC. f/k/a Woodworkers Warehouse, Inc., Debtor.**

**No. 03–13655 JBR.**

United States Bankruptcy Court, D. Delaware.

Aug. 5, 2004.

Charlene D. Davis, Christopher A. Ward, GianClaudio Finizio, Mary E. Augustine, Steven M. Yoder, The Bayard Firm, Wilmington, DE, for Debtor In Possession.

Donald J. Detweiler, Jeremy W. Ryan, Saul Ewing LLP, Wilmington, DE, for Creditor Committees.

## MEMORANDUM OF DECISION ON FIRST OMNIBUS OBJECTION OF DEBTOR TO GIFT CERTIFICATE CLAIMS AND OBJECTION OF ACTING UNITED STATES TRUSTEE TO THE DEBTOR'S [sic] AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINT PLAN OF REORGANIZATION

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter came before the Court for hearing on the First Omnibus Objection of Debtor to Gift Certificate Claims (the "Claims Objection") and the Objection of the Acting United States Trustee to the Debtor's [sic] and the Official Committee of Unsecured Creditors' Joint Plan of Reorganization of WW Warehouse, Inc., f/k/a/ Woodworkers Warehouse, Inc. (the "Confirmation Objection"). The Claims Objection and the Confirmation Objection raise the same issue, namely whether claims of holders of gift certificates, issued by the Debtor prepetition, are entitled to priority under 11 U.S.C. § 507(a)(6).[1]

---

1. Section 507(a)(6) provides

The following expenses and claims have

## BACKGROUND

The facts are undisputed and may be succinctly stated as follows. Prior to the Debtor's current bankruptcy,[2] it sold gift certificates to the public. Each gift certificate entitled the holder to apply, in whole or in part, the face amount of the certificate to the purchase of merchandise offered for sale by the Debtor. Before the outstanding gift certificates could be redeemed, the Debtor filed bankruptcy.

The Debtor scheduled the holders of outstanding gift certificates as general unsecured creditors. In its Claims Objection it objected to all gift certificate proofs of claim asserting a secured or priority status. Several gift certificate holders responded and advanced a variety of positions including that gift certificate claims were secured claims, or trust fund claims, or entitled to priority under section 507(a)(6). In the plan of reorganization, the proponents classified all claims of gift certificate claims as general unsecured claims. The Acting United States Trustee ("UST") objected to the plan on several

grounds, including that such claims were entitled to priority status. In response to the Confirmation Objection, the proponents modified the plan to state that gift certificate claims would be treated as priority claims pursuant to section 507(a)(6) if so ordered by the Court but they continued to assert that these claims are nothing more than general unsecured claims.

At the hearing on the Claims Objection and the Confirmation Objection, the Court overruled the Claims Objection and sustained the Confirmation Objection. Because this Court has observed a pattern of treating claims arising from gift certificates in retail bankruptcies as general unsecured claims,[3] the Court believes that setting forth its rationale in a published decision may be helpful.

## POSITION OF THE PARTIES

The dispute centers around only one very narrow issue, namely what is the meaning of the word "deposit" as used in section 507(a)(6).[4] The Debtor argues that gift certificates are not the same as deposits.[5] It asserts that gifts certificates rep-

---

priority in the following order:
> (6) Sixth, allowed unsecured claims of individuals, to the extent of $2,100 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

2. Woodworkers Warehouse, Inc. (the "Debtor" or "Woodworkers") was formed pursuant to the confirmed plan of reorganization filed in the case styled *In re Trend–Lines, Inc.*, filed in the United States Bankruptcy Court for the District of Massachusetts, Chapter 11 Case No. 00–15431–CJK (the "Massachusetts Bankruptcy"). Woodworkers and Trend–Lines, Inc. merged shortly after confirmation of the Trend–Lines' plan.

3. *See, e.g., In re ZB Company, Inc.*, United States Bankruptcy Court for the District of Delaware, Docket No. 03–13672(JBR).

4. No party has asked the Court to determine whether a creditor who is not a natural person is entitled to a priority under this section, *compare In re Carolina Sales Corp.*, 43 B.R. 596, 597 (Bankr.E.D.N.C.1984) (corporations are not "individuals" entitled to this priority) *with In re Elsinghorst Bros. Co.*, 180 B.R. 52, 53 (Bankr.W.D.N.Y.1995) (religious order, in its capacity as religious congregation and not in its capacity as corporation, could assert claims on behalf of its members) nor has the Debtor asserted that any of the gift certificates were purchased for commercial use rather than for "personal, family, or household use."

5. While the pleadings frame this issue as relating to "gift certificates," the outcome is no different with respect to any claimants holding merchandise credits or those who made partial payments on lay-away items.

resent paid-in-full transactions. It further alleges that a deposit must be only a partial payment on a future purchase and it must be given as a down-payment for specific goods. As support for its position, the Debtor relies upon *Northwest Financial Express, Inc. v. JWD, Inc. (In re Northwest Financial Express, Inc.)*, 950 F.2d 561 (8th Cir.1991), and *Bonner v. Allman (In re Heritage Village Church and Missionary Fellowship, Inc.)*, 137 B.R. 888 (Bankr.D.S.C.1991).

The UST asserts that the plain meaning of the word "deposit" does not encompass the limitations posited by the Debtor. Although the UST argues that section 507(a)(6) is unambiguous, if the Court were to find an ambiguity, the legislative history leaves no doubt that gift certificates are indeed deposits. In support of her position, the UST cites *Guarracino v. Hoffman*, 246 B.R. 130 (D.Mass.2000) and *In re Terra Distrib., Inc.*, 148 B.R. 598 (Bankr.D.Idaho 1992).

## DISCUSSION

■ In interpreting any statute, a court must "begin with the text of a provision and, if its meaning is clear, end there." *In re Price*, 370 F.3d 362, 368 (3d Cir.2004). "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (citations and internal quotations omitted); *Bailey v. City of Lawrence*, 972 F.2d 1447, 1451 (7th Cir. 1992) ("Where a word or a phrase has not been otherwise defined in a statute, a court should give it its plain and ordinary meaning."). The use of a word that has more than one meaning, however, often gives rise to an ambiguity. *Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.)*, 792 F.2d 125, 128 (10th Cir.1986).

■ These axioms, however, do not mean that a court interprets a single word in isolation or that it examines a solitary word to determine whether the word is ambiguous. This is especially true when interpreting the Bankruptcy Code.

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Statutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations. Specifically, in interpreting the Bankruptcy Code, the Supreme Court has been reluctant to declare its provisions ambiguous, preferring instead to take a broader, contextual view, and urging courts to "not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson*, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp., ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir.2003) (en banc)....

*Price*, 370 F.3d at 369.

■ If, after "a studied examination of the statutory context, the natural reading of a provision remains elusive," the statute is ambiguous and the Court must seek guidance beyond the statutory text. *Id.* Differing court interpretations of a statute "is evidence that the statute is ambiguous and unclear." *U.S. v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528, 1557 (E.D.Cal.1992).

Finally, even if a statute appears to be unambiguous, a court must not permit its plain language interpretation to stand if such interpretation runs counter to the drafters' intent. "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enter. Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (internal quotations, brackets and citation omitted).

Application of the foregoing principles can produce an uneven and unpredictable approach to statutory construction as has been the case when courts have interpreted section 507(a)(6). *See Wolfe v. Abbey (In re Glass)*, 203 B.R. 61 (Bankr.W.D.Va. 1996) (collecting and discussing cases interpreting section 507(a)(6)). Mindful that it is not to invade Congress' policy-making arena, the Court examines the statute in light of the foregoing principles.

### Section 507(a)(6)

"Equality of distribution among claimants is a central policy of the Bankruptcy Code.... Priority should not be afforded unless it is founded on a clear statutory purpose.... In other words, if one claimant is to be preferred over others, the purpose should be clear from the statute." *In re Continental Airlines, Inc.*, 148 B.R. 207, 211 (Bankr.D.Del.1992) (internal quotations and citations omitted). Such priorities should be narrowly construed to ensure that the often limited resources will be equally distributed. *In re DeAngelis Tangibles*, 238 B.R. 96, 98 (Bankr.M.D.Pa.1999).

Section 507(a)(6) provides a priority claim of up to $2,100 for certain individual consumer creditors. Those consumers hold claims "arising from" the prepetition "deposit ... of money in connection with the purchase, lease or rental of" undelivered property or unprovided services that were intended for the consumers' personal, family, or household use. Is the purchase of a gift certificate such a "deposit"? The answer depends on the meaning of the word "deposit."

### What is a "deposit"?

The Bankruptcy Code does not define "deposit." The word's ordinary meaning is thus the starting point and it is appropriate to turn to dictionaries for guidance. *See* 2A SUTHERLAND STATUTORY CONSTRUCTION § 46.2 (6th Ed.2004). A deposit is

1. The act of giving money or other property to another who promises to preserve it or to use it and return it in kind; esp. the act of placing money in a bank for safety and convenience. 2. The money or property so given.

BLACK'S LAW DICTIONARY (8th Ed.2004). A deposit is simply "something given for safekeeping," including "money given as a pledge or down-payment." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed.1993). There is nothing in these definitions that suggest that, when applied to a consumer purchase, a deposit must *only* be a partial payment of a purchase price and for specific merchandise. A down-payment, generally thought to be a partial payment, is only one of the definitions.

Moreover the cases cited by the Debtor do not convince the Court that it should impose the proffered limitations in defining "deposit." In *Heritage Village* Jim Bakker and the PTL Club solicited individuals to become "PTL Lifetime Partners." In exchange for a one-time payment of $1,000, which all of the solicitation material characterized as "gifts" or "investments," a Lifetime Partner was promised certain benefits, including the chance to stay at PTL Club hotels for a few days each year.

The partnership program was perhaps too successful in one respect. The debtor was unable to accommodate all of its Lifetime Partners' requests for reservations and as a result many partners got reservations years in advance and at inconvenient times. After a little more than three years, the PTL Club ceased soliciting Lifetime Partners and the PTL Club filed bankruptcy. The Lifetime Partners asserted that their $1,000 payments were entitled to priority treatment under section 507(a)(6). The court disagreed. It concluded that the language of section 507(a)(6) was unambiguous and thus rejected the Lifetime Partners' request to interpret the statute in light of its legislative history.[6] Turning to the dictionary for a definition, the court concluded that "the appropriate definition of deposit is that of 'putting down as a pledge' or 'partial payment.'" *Id.* at 896. In choosing this definition, however, the court ignored the five others it cited, none of which suggests a deposit must be a partial payment.[7]

The narrow definition of deposit adopted by *Heritage Village* has been criticized and rejected by other courts. In *DeAngelis Tangibles,* the court noted that "[t]he word deposit has several ordinary meanings." *Id.,* 238 B.R. at 98. In rejecting the argument that "deposit" referred to only a pledge or partial payment, the court cited to Comment a of Section 44 of the Restate-

ment (Second) of Contracts and found that the word simply referred "to money or other property transferred by an offeror to the account of an offeree" and thus was not restricted to any limitation that it be only a percentage of the total consideration. *Id.*

That the word deposit can mean either a partial payment or a full payment and that courts have construed the word in different ways support the UST's position that an examination of the statute's legislative history is appropriate. Several courts have agreed and undertaken just such an examination.

In *Terra Distributing* the court rejected *Heritage Village's* narrow definition and concluded that legislative history of section 507(a)(6) evidenced that a deposit included instances where full payment was made. "'A consumer that pays money on a layaway plan or as a deposit on merchandise, *or that buys a service contract or a contract for lessons or a gym membership,* is a general unsecured creditor of the business to which he has given his money.... In order to remedy this problem and to reorganize [sic] the position of consumer creditors as different from that of business creditors, the bill provides a priority for consumer creditors of a bankrupt business.'" *Terra Distrib.,* 148 B.R. at 600–01 quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 188 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5963,

---

**6.** The court also relied upon other facts to support its decision. Lifetime Partners were never assured of a particular room or even the availability of any room. Therefore the court concluded that there was no failure of delivery; "the rights and responsibilities" of the parties were "delivered and provided" prepetition and each transaction was complete. *Heritage Village,* 137 B.R. at 896. Finally the court noted that the debtor always referred to these payments as gifts or investments, never as deposits. *Id.*

**7.** The court cited WEBSTER'S DELUXE UNABRIDGED DICTIONARY, (2 Ed.1979) which the court stated defines deposit as follows:
(1) to lay aside; to lay down; to put; to place; as, a bird deposits her eggs in a nest. (2) to put or lay in a place for safekeeping or preservation; to store; as, to deposit goods in a warehouse. (3) to put (money) in a bank, as for safekeeping or to earn an interest. (4) to put down as a pledge or partial payment; as they deposited $500.00 on a new house. (5) to leave lying, as sediment. (6) to lay aside; to get rid of.

6148–49 (emphasis added). If the payment in full of services is a deposit, the court reasoned there is no reason to conclude Congress intended a deposit for goods to exclude full payments. *See also In re Tart's T.V., Furniture and Appliance Co., Inc.,* 165 B.R. 171, 173 (Bankr. E.D.N.C.1994) (extended warranty claimants are entitled to a sixth priority).

▮ This Court agrees. Congress would not have used the word deposit only once but expected it to have two different meanings depending upon whether the consumer puts money down for goods on lay-away or pays in full for a service contract. Identical terms within a statute have the same meaning. *In re Cohen,* 106 F.3d 52, 57 (3d Cir.1997), *aff'd sub nom. Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

Moreover, a further review of the legislative history of section 507(a)(6) [8] reveals that it was passed to give priority to consumers who found themselves in the same straits as gift certificate purchasers.

> The fifth priority under H.R. 8200 is new. It has been added as a result of testimony before the subcommittee on civil and constitutional rights concerning problems that consumers have encountered with bankrupt retail businesses with whom consumers have deposited money for goods or services. The bill gives a priority in the distribution of assets of a bankruptcy debtor to consumers who have deposited or made partial payments for the purchase or lease of goods, or the purchase of services, that were not delivered or provided. The priority comes after administrative expenses and wages, but before taxes. There is no similar provision in current law. A consumer that pays money on a lay-away plan or as a deposit on merchandise, or that buys a service contract or a contract for lessons or gym membership, is a general unsecured creditor of the business to which he has given his money. Very few creditors are aware of their status as general unsecured creditors. If the merchant involved files under the bankruptcy laws, the consumer is usually left holding the bag. Though he assumed his deposit was tantamount to a trust fund, he gets nothing from the estate of the debtor, because the assets available provide little return to unsecured creditors. Because of his ignorance and his inability to bargain with a retail merchant, he is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. A recent example is the W.T. Grant bankruptcy. All customers who held "Grant Script" have essentially lost their deposits. In order to remedy this problem and to reorganize the position of consumer creditors as different from those of business creditors, the bill provides a priority for consumer creditors of a bankrupt business....

H.R.Rep. No. 595, 95th Cong. 1st Sess. 188 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News at 6148–49.

The W.T. Grant problem which section 507(a)(6) was designed to correct arose when Grant, a retailer, filed bankruptcy.[9] Prepetition it had issued "scrip" to customers for their use in connection with future purchases. When Grant filed its Chapter

---

8. Section 507(a)(6) was originally codified as section 507(a)(5) but was recodified as (a)(6) when the Bankruptcy Amendments and Federal Judgeship Act of 1984 added a new fifth priority for the claims of grain producers and fishermen.

9. Although there is not a published decision dealing with the reduction of Grant scrip claims to unsecured status, the facts are reported in several sources. *See, e.g., Guaracino,* 246 B.R. at 133; 4 COLLIER ON BANKRUPTCY ¶ 507.08[1], 507.48 (15th Ed. Rev.1986) ("COLLIER").

XI petition for arrangement, scrip holders were treated as unsecured creditors.

This led to a large public outcry. Many of the people who had purchased scrip were under the belief that they had deposited money with W.T. Grant that remained theirs until they redeemed the scrip and were outraged to find that their money had been commingled and dissipated.

The drafters of the Code believed that it was appropriate to provide some protection to consumers in such situations. Unlike businesses that knowingly extend credit and run the risk of nonpayment, consumers that make advance deposits on merchandise do not typically realize that they are extending credit when they make an advance payment for goods or services.

Collier at ¶ 507.08[1], 507–49.

To relegate gift certificate holders to the status of general unsecured creditors perpetuates the very problem Congress sought to remedy. Further the Debtor fares no better when, relying upon *Northwest Financial,* it urges this Court to view the purchase of a gift certificate as a final and complete transaction.

In *Northwest Financial* the Eighth Circuit rejected appellants' argument that they held assignments of consumer priority claims. In that case the debtor had sold its own brand of uninsured money orders to individual customers of the appellants which were primarily grocery and convenience stores. When the debtor filed for bankruptcy and was unable to honor the money orders, the appellants redeemed them and took assignments of the consumers' claims against the debtor. The appellants argued that the assigned claims were entitled to priority status under section 507(a)(6). Finding the purchase of money orders "more akin to the purchase of a product (a transferable instrument) for immediate delivery which product is tradeable in lieu of cash," the court held otherwise. In the court's view, each consumer got what it purchased, namely a money order; whether the money order was honored or not was not part of the transaction.

With all due respect to the *Northwest Financial* court, the Court disagrees that its approach should be followed in this case. Consumers do not purchase gift certificates, whether they be in the form of paper or a plastic card similar to a credit card, as the ultimate purchase. Consumers expect merchants to apply some or all of the face value of the gift certificate toward the ultimate purchase. The gift certificate is really nothing more than scrip: "a document that entitles the holder to receive something of value." Black's Law Dictionary (8th Ed.2004).

## CONCLUSION

For the reasons set forth herein, the Claims Objection has been OVERRULED and the Confirmation Objection SUSTAINED. Separate orders have issued.