**In re FOUR STAR FINANCIAL SERVICES, LLC, Debtor.**

**Richard A. Marshack, Chapter 7 Trustee, Appellant,**

**Brian Hammond, Class Representative, Appellee.**

**No. CV 11–03266–CJC.**

United States District Court, C.D. California, Southern Division.

Feb. 6, 2012.

D. Edward Hays, Judith E. Marshack, Sarah C. Boone, Marshack Hays LLP, Irvine, CA, for Appellants.

David W. Meadows, David W. Meadows Law Offices, Los Angeles, CA, U.S. Trustee, United States Trustee, Los Angeles, CA, for Appellee.

## ORDER REVERSING THE BANKRUPTCY COURT'S FEBRUARY 9, 2011 ORDER

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION AND BACKGROUND

On February 9, 2011, the bankruptcy court denied the Appellant's motion to disallow the priority distribution of Appellee's claim under 11 U.S.C. § 507(a)(7) of the Bankruptcy Code. On March 19, 2010, the Appellant appealed the bankruptcy court's decision. The issue before this Court on appeal is whether the bankruptcy court correctly determined that Appellee's claim was a "deposit" for purposes of the statute and entitled to priority distribution. For the reasons explained below, the Court does not believe that the bankruptcy court did so.

This appeal arises from the bankruptcy of Thousand Adventures, Inc. ("TAI"), a Nebraska corporation, which began selling multi-generational campground memberships to individual consumers in the late 1980's. (Excerpts from Record on Appeal ("ER") 78–79, ¶¶ 2–3.) To become members, individuals paid an initiation fee which permitted them immediate access to TAI's network of approximately fifty-eight campgrounds throughout the United States. (ER 79.) The terms of the membership provided for lifetime services and use of the campground network, as well as transferability for the lifetime of three[1] future generations of the member. (ER 138.) On average, an initiation fee cost approximately $4,500 (ER 79), and members were required to pay annual dues to permit ongoing use of the TAI campground and facilities. (ER 78, ¶ 3.)

The purchase of memberships was often financed through retail installment contracts ("RICs"). (ER 137–38.) These RICs included promissory notes for the financed portion of the purchase price. (*Id.*) Through the promissory notes, members agreed to make monthly principal and interest payments for varying lengths of time. (ER 80.) At some point, TAI began to assign these RICs to various lenders as collateral for repayment of loans extended to TAI. (Br. for Appellant, at 4.) 900 Capital Services was one such lender that received assignments of RICs from TAI. (ER 81, ¶ 6.)

On January 1, 1997, Four Star Financial, LLC, purchased certain assets and assumed certain liabilities of 900 Capital Services through an Asset Purchase Agreement and Bill of Sale. (ER 81, ¶ 7.) Soon thereafter, TAI began experiencing financial difficulty and by March 1997 the company was near failure. (ER 80, ¶ 4.) Members of the TAI campground network then began to utilize their right to resell their membership and were informed TAI would not be honoring the agreement or that they would be entitled to a refund of their initiation fees. (*Id.*) Brian Hammond, a consumer who had purchased campground memberships and the Appellee here, filed a class action lawsuit in Iowa state court for breach of contract on behalf of himself and the certified class. (*Id.*) In August 1997, an involuntary bankruptcy petition was filed against TAI with the class recovering approximately $197,000. (*Id.*) In an attempt to seek additional compensation, Mr. Hammond amended the suit to include various third-parties who were assigned the RICs. (*Id.* at ¶ 5.) This included 900 Capital Services. (*Id.*)

(ER 139.)

---

1. Consumers were also capable of purchasing transferability for four future generations.

On October 24, 2003, an involuntary Chapter 11 petition was filed against Four Star Financial, LLC. On November 26, 2003, Richard A. Marshack was appointed trustee for the Chapter 11 proceedings. (Br. for Appellant, at 5.) Following the entry of default in Iowa state court, a judgment was entered against 900 Capital Services, Inc., for $4,528,795. (ER 308–213.) On December 29, 2003, Appellee filed a claim ("Claim") in the United States bankruptcy court for the Central District of California based on this default judgment, seeking $4,528,795. (Bankruptcy Court Dkt, Claim 9.) Appellee asserted seventh-level priority status under 11 U.S.C. § 507(a)(7) of Title 11 of the United States Code. The Four Star bankruptcy was converted on March 17, 2004, to one under Chapter 7, and the Trustee quickly filed a motion to, among other things, disallow the alleged priority status of the Claim. (Br. for Appellant, at 5.)

On February 9, 2011, the bankruptcy court issued an order denying the Trustee's motion to prevent Appellee from seeking priority status under section 507(a)(7). (ER 814.) In its decision, the bankruptcy court found the Claim entitled to priority distribution under section 507(a)(7). (ER 790.) On April 18, 2011, the Trustee appealed the bankruptcy court's order and the case was assigned to this Court.

## II. ANALYSIS

■ A district court reviews a bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. *Neilson v. United States (In re Olshan)*, 356 F.3d 1078, 1083 (9th Cir.2004).

The order in which a claim is entitled to recovery during bankruptcy proceedings may significantly affect the extent of a creditor's ability to recover on its claim. Recognizing that not all claims are equal,

the bankruptcy code assigns three different priority levels to creditors' claims: the secured creditor, the priority unsecured creditor, and the general unsecured creditor. 11 U.S.C. § 507. Priority unsecured creditor status is reserved for those:

> unsecured claims of individuals, to the extent of $2,600 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

11 U.S.C. § 507(a)(7). The two limitations imposed on those seeking priority distribution under section 507(a)(7) are (1) that the claim arise from the deposit of money and (2) that the services or goods remain undelivered.

The Trustee argues that the Claim is not entitled to priority distribution under section 507(a)(7) because no part of the initiation fee paid by Appellee is capable of being considered a "deposit" and all services upon which the Claim is based were delivered. In support of this argument, the Trustee analogizes the initiation fee to a country club membership, and points to *In re Palmas* for support. 443 B.R. 569 (Bankr.D.P.R.2010). In *Palmas*, country club members were "required to make an up-front payment called a membership deposit and to pay monthly or yearly dues." *Id.* at 570. The refundable membership deposits entitled purchasers to become members of the club, but did not entitle members access to club benefits. *Id.* Those benefits were only available with the payment of their monthly or yearly dues. *Id.* Any additional services or goods at the club's facility required further payment. *Id.* In denying priority status, the court in *Palmas* found it significant that members were immediately entitled to club member-

ship. The court reasoned that the "up-front payments provided by the club members were for an immediate service which was provided, and not for a future right to buy, lease, or rent any property." *Id.* at 575.

The Trustee compares the TAI campground membership to the country club membership in *Palmas,* arguing that the initiation fee paid by Appellee cannot be considered a deposit and that any services bargained for were delivered prior to the bankruptcy filing. Noting the absence of the term "deposit" in the RICs, the Trustee points to the lack of any conditions precedent or subsequent on which the amount paid by Appellee would be returned. (Appl't. Br., at 14.) As further indication that initiation fees were not deposits, the Trustee notes the lack of any evidence in the record that the promissory notes were held in trust. As in *Palmas,* the initiation fee guaranteed nothing more than entrance into the campground network. As to delivery, the Trustee argues the members' financial obligations to TAI were divided into two categories: the initiation fee and the yearly dues. (Appl't. Br., at 15.) With the purchase of the membership, members gained immediate admission to the campground network and nothing more. For continued use of the network's facilities, members were required to pay dues. Delivery occurred when the RICs were executed.

Appellee, on the other hand, contends that the Claim satisfies both prongs of section 507(a)(7), arguing that a down-payment is a deposit as defined by the Ninth Circuit in *In re Salazar,* 430 F.3d 992 (9th Cir.2005), and that he paid for services he did not receive.

In *Salazar,* the Ninth Circuit considered the case of a consumer who had paid to a pool contractor the full price for the construction of a swimming pool at the con-

sumer's home. *Salazar,* 430 F.3d at 994. When the pool was only partially complete, the pool contractor filed for bankruptcy. The Ninth Circuit reasoned that while part payment is what is typically understood as a deposit, nothing precluded from the definition full payment in advance. *Id.* at 995 ("[C]ourts that have considered the issue agree with our intuition that full payment by a consumer for goods or services to be rendered over time is a deposit within the meaning of the law."). Especially important to Appellee's argument, the Ninth Circuit found down-payments also within the definition of a deposit. *Id.* at 996 ("A down-payment, generally thought to be a partial payment, is only one of the definitions."). Ultimately finding the priority status of section 507(a)(7) to apply, the Ninth Circuit noted that "[m]erchants' violations of consumers' expectations and trust is precisely what Congress responded to when it passed [section 507(a)(7) ]". *Id.* at 996.

To support the contention that the initiation fee that he paid was a deposit, Appellee points to *Salazar's* inclusion of a down-payment in its definition of deposit, and the appearance of the term "down-payment" on the face of the RICs. (Br. for Appellee, at 14.) Appellee argues this connection demonstrates the initiation fee paid by him was, by being a down payment, a deposit within the meaning of section 507(a)(7). *Id.* As evidence of services remaining undelivered, Appellee cites the lifetime nature of the membership, as well as the transferability for three future generations. Appellee argues that he contracted for a transferable, lifetime membership, and the services to go with it, and at the time of bankruptcy he had not yet received all these services.

■ Both the Trustee and Appellee point to examples in which priority status under section 507(a)(7) was ostensibly de-

cided in their respective favor. After an examination of the case law, the Court finds that what is essential for a payment to be considered a deposit in the context of this case is that there be a payment in exchange for services and benefits to be provided in the foreseeable future. Without some services or benefits being provided in the foreseeable future, the initiation fee paid by Appellee cannot properly be considered a deposit.

The precise definition of deposit is not included in the Bankruptcy Code, but it has been defined as "money placed with a person as earnest money or security for the performance of a contract." *Black's Law Dictionary* 504 (9th ed. 2009). Courts considering the question of what constitutes a deposit have found a range of circumstances to qualify: full advance payment for the construction of a pool, *Salazar*, 430 F.3d at 997; gift certificates, *In re WW Warehouse, Inc.*, 313 B.R. 588, 595 (Bankr.D.Del.2004); the purchase of an extended warranty contract, *In re Tart's T.V., Furniture and Appliance Co., Inc.*, 165 B.R. 171, 173 (Bankr.E.D.N.C.1994); tuition payments, *In re Longo*, 144 B.R. 305 (Bankr.D.Md.1992); and consumer purchases on layaway, *Collier on Bankruptcy*, ¶ 507.09[2]. Conversely, courts have found section 507(a)(7) priority status inapplicable in the case of donations to a religious organization in exchange for lifetime benefits, *In re Heritage Village Church and Missionary Fellowship, Inc.*, 137 B.R. 888 (Bankr.D.S.C.1991), and membership in a country club. *Palmas*, 443 B.R. at 575.

All of the courts applying section 507(a)(7) priority find that a payment was made for some services and benefits that were expected in the foreseeable future but were never delivered. For example, in *In re WW Warehouse* the bankruptcy court found claims based on unredeemed gift certificates at the time of bankruptcy

entitled to priority status. 313 B.R. at 595. The court reasoned that gift certificate purchasers were similar to the class of consumers Congress intended to protect with the statute, namely "those who paid money on lay away plans or made deposits on merchandise assuming their deposit was tantamount to a trust fund." *Id.* at 573. In other words, the statute was written to protect those consumers "left holding the bag" when a merchant files for bankruptcy. 4 *Collier on Bankruptcy*, ¶ 507.09. In the examples cited by the parties, as well as those in the legislative history, where the priority was found to apply, an element of future assurance or security existed. It is obvious that section 507(a)(7) was passed to protect consumers who made payments, whether partial or full, expecting their money would be held until the services they were purchasing were provided, and that the money remained theirs until such delivery. *See Palmas*, 443 B.R. at 574.

Appellee argues that the use of the term down-payment in the RICs and *Salazar's* finding that a down-payment is within the definition of deposit, is clear evidence that his Claim should be granted section 507(a)(7) priority status. The Court does not find this argument persuasive for two reasons. First, the facts of *Salazar* are distinguishable from the instant case. In *Salazar*, the consumer had paid in advance the full price of the swimming pool, and was left with an unfinished product when the pool contractor, the debtor, filed bankruptcy. The consumer paid for something the consumer had not yet received. The full, advance payment, while foolish, was for something in the future. Appellee strains to compare his situation to that in *Salazar*. In finding priority status applicable, the Ninth Circuit noted that "courts that have considered the issue agree with our intuition that full payment by a consumer for goods or services to be rendered over time is a deposit within the meaning

of the law." *Salazar*, 430 F.3d at 995. In contrast to the facts of *Salazar*, the initiation fee paid here by Appellee entitled him to immediate use of the campground network. With the payment of the initiation fee, Appellee was immediately a member. He was not waiting for services to be rendered by TAI. Somewhat illogically, Appellee points to his lifetime membership and transferability as evidence of undelivered services. Assuming this were true, Appellee's bargained-for services would not be delivered for several generations. While not discounting the premium placed on the longevity and transferability of the memberships, the Court finds these benefits inherent in the membership Appellee received immediately, rather than something incapable of delivery for several generations. Second, the *Salazar* opinion provided equity to a consumer who, for better or worse, made the mistake of advancing the full purchase price before delivery. The consumer in *Salazar* paid in full for a swimming pool and was left instead with what was likely just a large hole in the ground. Finding priority status should apply, the Ninth Circuit noted that "[p]erhaps nobody should be credulous enough to give a contractor or merchant the whole payment for goods and services up front, rather than some fraction of the payment." *Salazar*, 430 F.3d at 996. Protecting this type of consumer "is precisely what Congress responded to when it passed the statute in question." *Id.* Here, Appellee did not pay in full for a campground that was never built. Rather Appellee paid an initiation fee and was immediately entitled to avail himself of the entire campground network. Appellee contracted with his eyes wide open, and while he might not have foreseen the financial trouble of TAI, this was a risk he took in signing up to be a member of the campground network.

While not perfectly analogous, the Court finds the facts of *Palmas* more closely resemble the instant case. Just as in *Palmas*, the initiation fee entitled Appellee to the immediate use of the facilities. The initiation fee was not paid for the future guarantee of services and monthly dues were required in order to continue utilizing the campground network. Similar to *Palmas*, should a member fail to pay his or her monthly dues, the campground membership could be revoked. In both the country-club and campground networks, membership was immediate and future services were contingent on the payment of monthly dues. In neither case was the initiation fee offered as security for the future provision of services; it was merely the price of admission. Thus, the initiation fee was not a deposit and the bankruptcy court erred by giving Appellee's Claim priority under section 507(a)(7).

## III. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's February 9, 2011 Order is VACATED and the case is REMANDED for proceedings consistent with this order.